880 A.2d 307

**REICHS FORD ROAD JOINT VENTURE**

**v.**

**STATE ROADS COMMISSION OF THE STATE HIGHWAY ADMINISTRATION, Maryland Department of Transportation.**

**No. 137, Sept. Term, 2004.**

Court of Appeals of Maryland.

Aug. 12, 2005.

502

Dennis E. Ettlin (Brown & Sturm, Rockville, on brief), for petitioner.

Janet Bush Handy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Peyton Paul Phillips, Asst. Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER *, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

We issued a writ of certiorari in this case to determine whether an award, in settlement of a formal eminent domain proceeding, of "fair market value," as defined in Md.Code (1974, 2003 Repl.Vol.), § 12–105 of the Real Property Article, contemplates the inclusion of lost rents, carrying costs, and

---

* Raker, J., participated in the oral argument, but did not participate in the decision or the adoption of this opinion.

other damages incurred as a result of the condemnor's pre-condemnation conduct. Concluding that such damages are indeed compensable under that statute, we hold that, when a condemnor's pre-condemnation conduct results ultimately in formal condemnation proceedings, all damages resulting from that conduct ordinarily would be included in the award of "fair market value" relating to the condemnation award. On the record of this case, however, a justification may exist to permit the former property owner to pursue the alleged pre-condemnation damages in a separate action. In order to resolve whether that is appropriate, fact-finding may be required. A remand to consider that, therefore, is appropriate.

## I.

This case involves 33,000 square feet of commercially zoned land, previously owned by Reichs Ford Road Joint Venture ("Reichs Ford"), a Maryland general partnership, located along Urbana Pike in Frederick County, Maryland. Prior to the formal exercise of eminent domain in 2001 by the State Roads Commission of the State Highway Administration of the Maryland Department of Transportation ("SHA" or "Administration"), the land was improved with a gasoline service station.

In the summer of 1987, the SHA, pursuant to powers vested in it under § 40B of Article III of the Maryland Constitution,[1] issued a general public announcement pertaining to a newly proposed interchange at Routes 85/355, near the subject property, in Frederick County. In October of that year, Griffith Consumers ("Griffith") entered into a ten-year lease agreement with Reichs Ford to operate a gas station on the property.

---

1. Section 40B provides that "where such property, in the judgment of the State Highway Commission is needed by the State for highway purposes, the General Assembly may provide that such property be taken immediately ..." Md. Const. art. 3, § 40B. The public announcement in 1987 did not constitute the formal exercise of eminent domain.

In a letter dated 20 December 1988, the SHA informed Reichs Ford that it had scheduled construction for the new interchange and that the project would affect substantially the subject property. The letter also stated that an appraiser was selected to appraise the subject property and that the SHA would make a purchase offer within six months. Although the SHA commissioned a number of ensuing appraisals, for which Reichs Ford made available its lease agreement and the monthly rental receipts during the lease term, the Administration made no offers to purchase the subject property.

Seven years later, in August of 1995, Reichs Ford received another letter from the SHA advising that yet another appraiser had been selected to appraise the subject property, after which an offer of just compensation would be made. In February of 1996, the SHA offered to purchase the subject property for $950,000. A negotiated sale did not result from this offer.

Between 1996 and 1997, the SHA met with Griffith, the lessee of the subject property, to inform it of the intended condemnation and its entitlement to relocation assistance. The SHA also drafted a lease termination agreement for Griffith to execute and deliver to Reichs Ford. Upon the expiration of the initial lease term in 1997, Griffith elected not to exercise its option to extend the lease term with Reichs Ford, apparently due to the looming specter of condemnation. Griffith, however, did hold over temporarily on a month-to-month basis at a reduced rent, eventually vacating the property on 30 June 1998. Thereafter, Reichs Ford claims that it was unable to lease the property as a gas station or for any other economically viable use due to the SHA's plans.

Between 1998 and 2000, Reichs Ford requested informally, on several occasions, that the SHA formally exercise its eminent domain powers or abandon the proposed taking of the subject property. During this period, Reichs Ford continued regularly to update the SHA regarding the alleged damages being incurred as a result of the Administration's indecision.

Nevertheless, the SHA did not take any meaningful steps toward the institution of formal condemnation proceedings.

Frustrated with the SHA's inaction, Reichs Ford filed a complaint in the Circuit Court for Frederick County on 31 January 2000, claiming damages based on a theory of inverse condemnation.[2] Reichs Ford claimed that, by placing its property "under the cloud of imminent condemnation" for such a lengthy period of time, the SHA rendered the property economically unusable and thus was liable for damages that accrued as a result of the unwarranted delay. Reichs Ford's complaint sought damages incurred from the time Griffith failed to exercise its option to extend the lease and the filing of the complaint. The damages included, among other things, lost rents, property taxes, and carrying costs.[3]

On 8 March 2001, the State instituted condemnation proceedings in the Circuit Court for Frederick County to acquire the subject property and the improvements thereon. Sometime thereafter, Reichs Ford and the SHA initiated settlement

---

**2.** On 21 June 2000, Reichs Ford filed an amended complaint, adding additional counts for Interference with Economic Relations (Count II), Intentional and Improper Interference with Plaintiff's Business Expectations (Count III), and Unwarranted Interference with a Contractual Relationship (Count IV). Upon motion by the SHA, Counts II, III, and IV were dismissed with prejudice by the Circuit Court on 21 February 2001 for failure to comply with the notice provisions of the Maryland Tort Claims Act. Md.Code (1984, 2004 Repl.Vol.), § 12–106(b) *et seq.* of the State Government Article. The dismissal of these counts are not challenged by Reichs Ford here. Section 12–106(b) remains unamended in the 2004 Replacement Volume from the version in effect at the time of the hearing.

**3.** In its answers to the SHA's interrogatories, Reichs Ford itemized its damages as follows:

Lost Rental Income 1 November 1997 through October 2000 with carrying costs for delayed payment at 8%—$465,647.50
Real Estate Taxes—1998 through 2001 with interest—$17,350.83
Final interest payment—$1,997.46
Cost of tanks removal—$10,803.40
Driveway barricades—$2,100.00
County of Frederick, water and sewer charges (1999 and 2000)—$1,394.81
Fire Insurance—$207.00
Total Damages as of 7/01/01—$541,328.50

negotiations regarding all pending claims related to the subject property. Reichs Ford proposed two alternatives. First, it proposed to settle both the SHA's eminent domain action and the pending inverse condemnation suit for the total sum of $1,525,000. Alternatively, Reichs Ford proposed to settle *only* the eminent domain claim for $1,325,000, on the condition that it could continue to prosecute the inverse condemnation claim. The SHA, by letter of its counsel dated 19 June 2001, chose the second option and the parties executed an Agreed Inquisition in the eminent domain action calling for $1,325,000 in damages.

This agreement was filed with the Circuit Court on 22 June 2001, resolving effectively the condemnation claim. The parties continued to litigate the inverse condemnation action. After the parties engaged in discovery, the SHA filed a motion in limine on 30 January 2003. The motion argued that the damages Reichs Ford was seeking, described in the body of the brief motion as "lost rental income, real property taxes, mortgage interest, etc.," were "not allowed in a condemnation case" and asked the court for the following relief:

A.   That the Court enter an order barring plaintiff from introducing evidence at trial pertaining to lost rental income, real property taxes, etc.; and

B.   For such other and further relief as the nature of the case may require.

The Circuit Court held a hearing on the motion in limine on 3 March 2003, during which the trial judge made the following observation:

Basically what is before the court now is defendant's motion in limine, which I think, although it's not framed as a motion to dismiss, if I grant the motion in limine, I believe, . . . it is, in effect, dismissing plaintiff's claim because the only element of damages alleged in this case are the lost profits and those items which are subject to [the SHA's] motion in limine.

The court continued, reasoning that

basically this is an in rem action and the measure of damages is the value of property taken. I don't find any

authority that the Court finds compelling to authorize a suit in these circumstances where the measure of damages is loss of rental income in the in rem proceeding.

Therefore, I am going to grant [SHA's] motion in limine as to any evidence as to lost profits and lost rental income for the period of time at issue in this case, which is prior to the actual condemnation being taken. So in effect, it is a legal motion to dismiss, and quite honestly, let the Court of Special Appeals tell us how we're supposed to proceed in these circumstances because this Court is just not clear, and I'm erring on the side of viewing the statute being the value of the land taken.

On 16 April 2003, the Circuit Court entered an order granting SHA's motion in limine and dismissing the case. Reichs Ford noted a timely appeal to the Court of Special Appeals. On 19 October 2004, in an unreported opinion, the Court of Special Appeals affirmed the judgment of the Circuit Court, holding that the proper vehicle for Reichs Ford to have proven and recovered the damages sought in the inverse condemnation suit was the settled action for condemnation. The intermediate appellate court found that, although the damages claimed by Reichs Ford may be recoverable in some instances, "[c]learly, the General Assembly intended for any diminution in value of property caused by the pre-condemnation activities of the condemnor be considered in computing fair market value" in the SHA's eminent domain action. The Court of Special Appeals noted also that, although the General Assembly has provided for recovery beyond the fair market value in certain specified circumstances, none of these circumstances was present in Reichs Ford's claim. Reichs Ford petitioned this Court for a writ of certiorari, which we granted, 385 Md. 162, 867 A.2d 1062 (2005), in order to consider the following question:

Did the Circuit Court err in precluding Reichs Ford from introducing evidence of lost rental income, real property taxes, etc. resulting from the SHA's activities prior to its exercise of the power of eminent domain?

## II.

### A.

The Circuit Court granted the SHA's motion in limine, treating it as a motion to dismiss for failure to state a cause of action. Md. Rule 2–322. The question before us thus becomes whether the Circuit Court erred in dismissing Reichs Ford's inverse condemnation complaint based on the court's determination to exclude certain evidence. We review the grant of a motion to dismiss *de novo. Adamson v. Corr. Med. Servs.,* 359 Md. 238, 246, 753 A.2d 501, 505 (2000) (citations omitted). We examine whether the complaint, assuming all well-pleaded facts and reasonable inferences drawn therefrom in a light most favorable to the pleader, states a legally sufficient cause of action. *Id.* at 246, 753 A.2d at 505. Dismissal is proper only if the complaint would fail to provide the plaintiff with a judicial remedy. *Bobo v. State,* 346 Md. 706, 709, 697 A.2d 1371, 1373 (1997). In the present case, the Circuit Court concluded that, once Reichs Ford was precluded from presenting the implicated evidence of damages, dismissal of its claim was proper. In order to determine whether dismissal was proper in this case, we therefore must first examine whether granting the motion in limine was proper.

### B.

The motion in limine, which the Circuit Court granted without elaboration, qualification or limitation, sought to exclude "damages for lost rental income, real property taxes, *etc.*" (emphasis added) [1] for the time period prior to the filing by the SHA of the eminent domain action. The motion in limine in this case is not a model of precision or clarity. A written motion must state its premises and relief sought *with particularity.* Md. Rule 2–311 (emphasis added). Because the motion in limine here used the vague term "etc." to

---

**4.** The body of the motion itemized "lost rental income, real property taxes, mortgage interest, etc.," while the relief sought referred to "lost rental income, real property taxes, etc."

describe its request for potentially unlimited broad relief, how is a court to know the full extent of the assumed evidence it is being asked to exclude, or what the proper legal grounds for such a sweeping exclusion may be? The granting of the motion in limine in such wholesale fashion, without question, elaboration, qualification or limitation, leaves this Court with the untenable task of guessing, to some degree, at the full scope of the evidence intended to be excluded.

## C.

Even were we to overlook the relative vagueness of the request in the motion in limine, we conclude that granting the motion was legally incorrect. The SHA argued in its motion that types or categories of evidence it foresaw might be offered by Reichs Ford should be barred from consideration because, according to the SHA, "such damages are not admissible in a condemnation case." The Circuit Court agreed, stating that it did not "find any authority that the Court finds compelling to authorize a suit in these circumstances where the measure of damages is loss of rental income in the in rem proceeding."

In order to determine whether Reichs Ford may recover lost rents and other related damages in an inverse condemnation suit versus a traditional condemnation claim, we first must examine how, and under what authorities, a condemnee may be compensated when property is taken as a result of the exercise of eminent domain. Both the United States and Maryland Constitutions prohibit the sovereign from taking private property for public use without just compensation. U.S. Const. amend. V; Md. Const. art. 3, § 40. The measure of damages in a condemnation proceeding at common law in Maryland was the value of the real property taken. *Pumphrey v. State Roads Comm'n*, 175 Md. 498, 505, 2 A.2d 668, 671 (1938). The general theory behind that conceptualization of just compensation was that the individual property owner should be placed in as good a position financially as he or she would have been but for the establishment

of the public project. *Dodson v. Anne Arundel County,* 294 Md. 490, 494, 451 A.2d 317, 320 (1982). Moreover, the economic impact of a public project should be borne by the public as a whole and not by a single property owner or a group of individual property owners. *Armstrong v. United States,* 364, U.S. 40, 49, 364 U.S. 40, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Just compensation, as interpreted under the Maryland Constitution, however, only requires compensation for real property interests. *See, e.g., Shipley v. Balt. & Potomac R.R. Co.,* 34 Md. 336, 343 (1871) (holding that just compensation means the actual value in money of the property). Losses incidental to an interest in real property, such as moving costs, taxes, and lost rents generally were not required to be compensated for when the government exercised its powers of eminent domain to take permanent and total possession of a property under the common law. *See id.* at 343 (stating that just compensation does not include benefits, advantages, or damages incidental to the interest in real property and caused by the public project). Practically speaking, there are many hidden costs involved in the acquisition of property by the government for public projects that have not been determined to be compensable as a matter of common law.

██ In this case, Reichs Ford does not allege a traditional claim for just compensation as the result of formal condemnation, however, but rather seeks damages incidental to inverse condemnation. Inverse condemnation has been described as a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *U.S. v. Clarke,* 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980). In claims for condemnation where there has been a temporary taking, courts have found that, based on federal constitutional principles, a proper measure of damages may be the lost rental value between the initial taking and the time that the property is returned or restored. *See Kimball Laundry Co. v. U.S.,* 338 U.S. 1, 7, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765 (1949) (finding that for an expressly temporary governmental occupation of property,

effectively a temporary taking, a measure of fair market value may be the value a renter would have paid for the property). It would appear then that the Circuit Court's view in the present case that lost rental income is not admissible evidence in any condemnation context is not universally true. *See Bergeman v. State Roads Comm'n,* 218 Md. 137, 140, 146 A.2d 48, 50 (1958) (noting that capitalizing rent is an approved method of valuation of property); *Brinsfield v. City of Baltimore,* 236 Md. 66, 71, 202 A.2d 335, 337 (1964) (finding that capitalized rents are admissible when determining fair market value of a property to be condemned).

In *Kimball,* the Supreme Court held that, in the case of a temporary taking, lost rental income was part of the proper measure of damages. 338 U.S. at 7, 69 S.Ct. at 1438, 93 L.Ed. 1765. In that case, the government occupied a private laundry business on an expressly temporary basis so that it could be run as a laundry for U.S. Army personnel. *Id.* at 4, 338 U.S. 1, 69 S.Ct. at 1437, 93 L.Ed. 1765. After the property was returned to the private owner, the trial court awarded damages based on the lost rental income, as well as wear and tear beyond the norm of the company's equipment. *Id.* at 4, 338 U.S. 1, 69 S.Ct. at 1437, 93 L.Ed. 1765. In affirming the judgment of the trial court, the Supreme Court reasoned that the

> determination of the value of temporary occupancy can be approached only on the supposition that free bargaining between petitioner and a hypothetical lessee would have taken place in the usual framework of such negotiations. We agree, however, with both lower courts, therefore that the proper measure of the award is the rental that probably could have been obtained, and so this Court has held in the two recent cases dealing with temporary takings. Indeed, if the difference between the market value of the fee on the date of taking and that on the date of return were taken to be the measure, there might frequently be situations in which the owner would receive no compensation whatsoever because the market value of the property had not decreased during the period of the taker's occupancy.

*Id.* at 7, 338 U.S. 1, 69 S.Ct. at 1438, 93 L.Ed. 1765 (citations omitted); *U.S. v. General Motors Corp.*, 323 U.S. 373, 381, 65 S.Ct. 357, 361, 89 L.Ed. 311 (1945) (holding that, where the government occupies property temporarily, the measure of compensation is the measure of the interest taken, or the "fair rental value"); *see W.H. Pugh Coal Co. v. State*, 157 Wis.2d 620, 460 N.W.2d 787, 791 (1990) (finding that lost income, such as rental value, when shown to a reasonable degree of certainty, may be admitted when determining just compensation in certain cases) (citations omitted). The Court also found that, constitutionally speaking, fair market value is usually the only measure of damages in an eminent domain condemnation. *Kimball*, 338 U.S. at 5–6, 69 S.Ct. at 1438, 93 L.Ed. 1765. In the case of a temporary taking, however, fair market value alone may not be enough to equal just compensation. *Id.* at 6, 338 U.S. 1, 69 S.Ct. at 1438, 93 L.Ed. 1765. Although *Kimball* involved a temporary taking under a formal condemnation scheme, we believe that its language is equally applicable to situations, such as that here, where the temporary taking occurs in an alleged inverse condemnation context. We therefore conclude that Reichs Ford's proposed evidence of lost rental income and related damages should not have been barred pre-trial through the grant of a motion in limine.

## III.

### A.

Reichs Ford argues that there were two causes of action pleaded in the facts in its complaint. Reichs Ford believes it is entitled to "just compensation" for the value, as of the date the SHA filed the condemnation suit,[5] of the property itself

---

5.  In § 12–103, the Legislature set forth the time at which the condemned property should be valued, for compensation purposes, in a condemnation proceeding:

    Unless an applicable statute specifies a different time as of which the value is to be determined, the value of the property sought to be condemned and of any adjacent property of the defendant claimed to be affected by the taking shall be determined as of the date of the

and damages in inverse condemnation resulting from lost rents and carrying costs incurred from the time the tenant, Griffith, vacated the property until the day the condemnation suit was filed. *See Stone v. City of L.A.*, 51 Cal.App.3d 987, 994, 124 Cal.Rptr. 822 (1975) (finding that the losses of the property owner beyond the value of the real property and attributable to the lapse in time between the announcement of condemnation and the actual taking were compensable). Reichs Ford claims that its offer to settle the condemnation claim was consistent with this theory of two separate claims. In support of its assertion that there exists independently both an inverse condemnation claim and a traditional condemnation claim, under the circumstances of this case, Reichs Ford relies on the following language in *First English Evangelical Lutheran Church of Glendale v. Los Angeles*, 482 U.S. 304, 319, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987),

> [t]he value of a leasehold interest in property for a period of years may be substantial, and the burden on the property owner in extinguishing such an interest for a period of years may be great indeed. Where this burden results from governmental action that amounted to a taking, the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period. (citations omitted)

Reichs Ford argues that, because the SHA's activities with respect to the subject property, including its interactions with

---

taking, if taking has occurred, or as of the date of the trial, if taking has not occurred.

In *J.L. Matthews, Inc. v. Maryland–Nat'l Capital Park and Planning Com'n*, 368 Md. 71, 792 A.2d 288 (2002), this Court further clarified the date of taking for regular condemnation proceedings. In a "quicktake" proceeding the taking occurs immediately. *Id.* at 99, 792 A.2d at 304. In a "regular" condemnation case, however, the taking does not occur until final judgment is entered. *Id.* at 99, 792 A.2d at 304. For that reason, in a "regular" condemnation suit, the property owner technically may still do as he pleases with his or her property until final judgment is entered. *Id.* at 100, 792 A.2d at 305. Reichs Ford's argument appears to be that the government's declarations about pursuing the road project and how that impacted the subject property prevented it from doing as it pleased with its land, namely renting it.

Griffith, amounted to a taking of Constitutional dimension, it was therefore entitled to just compensation for that taking. *Id.* at 319, 107 S.Ct. at 2388, 96 L.Ed.2d 250 (1987).[6] Reichs Ford bases its takings claim on its contention that, as a result of the SHA's activities, a new lessee could not be found and the property could not be used in any other profitable way.

## B.

The SHA argues, however, that Reichs Ford's claim for inverse condemnation should fail because any damages that occurred as a result of the SHA's pre-condemnation conduct was subsumed in the award of "fair market value" entered in the Agreed Inquisition condemnation award. The SHA contends that, under Md.Code (1974, 2003 Repl.Vol.), § 12–105 of the Real Property Article,[7] the fair market value of the property taken under the powers of eminent domain includes all diminution in value proximately caused by the public project. § 12–105 provides, in relevant part, as follows:

§ 12–105.  Fair Market Value

(a) *Effective date of authority if continuing powers of condemnation*—In this section, the phrase "effective date of legislative authority for the acquisition of the property" means, with respect to a condemnor vested with continuing power of condemnation, the date of specific administrative determination to acquire the property.

---

**6.** There are those who believe *First English* has become a "dead letter" due to the later case of *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). In *Tahoe,* the Supreme Court decided that the government did not have to pay compensation for a moratorium on construction in a given area while studies to prevent further pollution of Lake Tahoe were conducted. *Id.* at 311, 122 S.Ct. at 1472, 152 L.Ed.2d 517. In performing our analysis here, however, we assume that Reichs Ford would be able to demonstrate that its property was in fact "taken" for purposes of condemnation analysis. That determination, of course, must be made in the first instance by a trial court.

**7.** Unless otherwise indicated, all subsequent statutory references shall be to the Real Property Article.

(b) *Fair market value*—the fair market value of property in a condemnation proceeding is the price as of the valuation date for the highest and best use of the property which a vendor, willing but not obligated to sell, would accept for the property, and which a purchaser, willing but not obligated to buy, would pay, excluding any increment in value proximately caused by the public project for which the property condemned is needed. In addition, fair market value includes any amount by which the price reflects a diminution in value occurring between the effective date of legislative authority for the acquisition of the property and the date of actual taking if the trier of facts finds that the diminution in value was proximately caused by the public project for which the property condemned is needed, or by announcements or acts of the plaintiff or its officials concerning the public project, and was beyond the reasonable control of the property owner.

The SHA argues that the phrase "diminution in value" applies to all lost rents and carrying costs, if Reichs Ford is entitled to these damages at all, from the date that the SHA specifically determined to acquire the subject property. In the SHA's view, because the parties settled the issue of the "fair market value" of the property, as defined by § 12–105, in the Agreed Inquisition executed in the condemnation case, the damages claimed by Reichs Ford in its inverse condemnation suit already have been paid.

1.

We are called upon to determine whether § 12–105 contemplates the inclusion in an award of fair market value in a condemnation case of lost rents and other incidental damages solely attributable to the period between when the condemnor initially announces the public project and when the condemnation eventually is initiated. This question is one of statutory interpretation and, as such, is purely a legal one. *Mohan v. Norris*, 386 Md. 63, 66–67, 871 A.2d 575, 577 (2005). We therefore review the judgment of the Court of Special Appeals *de novo. Id.; see also Davis v. Slater*, 383 Md. 599, 604, 861

A.2d 78, 80–81 (2004) (stating that "because our interpretation of . . . provisions of the Maryland Code . . . are appropriately classified as questions of law, we review the issue *de novo* to determine if the trial court was legally correct in its rulings on these matters").

The cardinal rule of statutory interpretation is to ascertain and carry out the real intention of the Legislature. *Eng'g Mgmt. Servs. v. Maryland State Highway Admin.*, 375 Md. 211, 224, 825 A.2d 966, 974 (2003). First looking to the language of the statute itself and its stated intention, the Court accords the words of the statute their ordinary and natural significance. *Id.* at 224, 825 A.2d at 974 (citations omitted). Equally important, the statute is to be read so that no word, phrase, clause, or sentence is rendered meaningless. *Fraternal Order of Police of Montgomery County v. Mehrling*, 343 Md. 155, 180, 680 A.2d 1052, 1065 (1996) (citations omitted).

Although just compensation traditionally has been measured by the concept of fair market value, this conceptualization is merely the constitutional minimum. Fair market value was defined at common law as "what a reasonable owner, willing but not obligated to sell would accept and a reasonable buyer, willing but not obligated to buy, would pay." *See State Roads Comm'n v. Warriner*, 211 Md. 480, 485, 128 A.2d 248, 251 (1957) (reiterating the common law definition of fair market value). This standard, however, as previously observed, may not compensate fully a property owner for all of his or her expenses relating to a condemnation proceeding. *Shipley*, 34 Md. at 343 (noting that it is for the Legislature to decide what, if any, other incidental damages are to be awarded beyond the Constitutional minimum of just compensation in a condemnation case). In order to bridge the gap between "just" compensation and "full" compensation, States and other governments are free to expand the range of available compensable damages by statute or regulation. *Lore v. Board of Public Works*, 277 Md. 356, 358–359, 354 A.2d 812, 814 (1976). This approach was acknowledged initially in Maryland when, at the sugges-

tion of this Court,[8] the General Assembly set out to liberalize the definition of fair market value. Report of the Legislative Council Committee to Revise the Condemnation Laws of Maryland, 274, 14 November 1962.

Pursuant to this goal, the General Assembly commissioned a study of the problems inherent in the measure of fair market value in Maryland, which, prior to the relevant statutory enactments in 1963, was defined solely by common law. Report to the General Assembly of 1963, Proposed Bills, Special Committee Reports, vol. 1, 3 (stating that an intention of the bill was to codify all of the substantive law of condemnation, which to that point existed largely only in case law). The General Assembly, in enacting the statutory scheme in response to the study, stated its intention clearly:

It is desired to codify in the Code all of the substantive law of condemnation, much of which has existed as case law. In doing this, the Committee has *liberalized* provisions for damages and other expense and losses on the part of condemnees and tenants of condemned property.

*Id.* (emphasis added)

One of the main problems contemplated by the study was that of public governmental announcements that affected property values. Report of the Legislative Council Committee, *supra*, at 281; 1963 Md. Laws, Chap. 52. Occasionally, as happened in the present case, the government announces its intention to take certain property or involve itself in public projects long before the actual taking occurs. *See City of Baltimore v. United Five and Ten Cent Stores*, 250 Md. 361, 369, 243 A.2d 521, 525 (1968) (finding that, under § 12–105, a

---

8. In *Friendship Cemetery v. City of Balt.*, 197 Md. 610, 620, 81 A.2d 57, 62 (1951), we noted that

[p]ublic improvements often cause severe incidental damages for which, under this rule, no compensation may be obtained. But it must be remembered that despite the examples of constitutional amendments and statutes enacted in other jurisdictions, none have been enacted in this state; and the fact imposes on the courts all the more firmly the duty of observing the limits of the constitutional prohibition.

jury could consider all diminution of value from the time the condemning authority made the first announcement of the public project involving the subject property). As alleged in Reichs Ford's complaint here, the property may experience a substantial diminution in value caused by, among other things, vacating tenants and the inability to put the property to any other viable use, and other costs of maintaining a property while waiting for the government formally to exercise eminent domain or renounce its interest. Report of the Legislative Council Committee, *supra*, at 281; 1963 Md. Laws, Chap. 52. Other exemplary problems noted by the study included a lack of compensation for moving costs. Report of the Legislative Council Committee, *supra*, at 275; 1963 Md. Laws, Chap. 52.

In an attempt to remedy these problems, the Legislature enacted § 12–105(b), which, as initially introduced in the Legislature, read:

The fair market value of property in a proceeding for condemnation shall be the price as of the valuation date for the highest and best use of such a property which a seller, willing but not obligated to sell, would accept for the property, and which a buyer, willing but not obligated to buy, would pay, therefore, excluding any increment in value proximately caused by the public project for which the property condemned is needed, plus the amount, if any, by which such price reflects a diminution in value proximately caused by the public project for which the property condemned is needed, or by announcements or acts of the plaintiff or its officials concerning such public project.

1963 Md. Laws, Chap. 52. During the legislative process, the bill was amended by adding new language relating to the date of the valuation of the property, which is indicated below in capital letters:

The fair market value of property in a proceeding for condemnation shall be the price as of the valuation date for the highest and best use of such property which a seller, willing but not obligated to sell, would accept for the property, and which a buyer, willing but not obligated to

buy would pay therefore excluding any increment in value proximately caused by the public project for which the property condemned is needed, plus the amount, if any, by which such price reflects a diminution in value OCCURRING BETWEEN THE EFFECTIVE DATE OF LEGISLATIVE AUTHORITY FOR THE ACQUISITION OF SUCH PROPERTY AND THE DATE OF THE ACTUAL TAKING IF THE TRIER OF FACTS SHALL FIND THAT SUCH DIMINUTION IN VALUE WAS proximately caused by the public project for which the property condemned is needed, or by announcements or acts of the plaintiff or its officials concerning such public project, AND WAS BEYOND THE REASONABLE CONTROL OF THE PROPERTY OWNER.

IF THE CONDEMNOR IS VESTED WITH A CONTINUING POWER OF CONDEMNATION, THE PHRASE EFFECTIVE DATE OF LEGISLATIVE AUTHORITY FOR THE ACQUISITION OF PROPERTY, AS USED IN THIS SECTION, SHALL MEAN THE DATE OF SPECIFIC ADMINISTRATIVE DETERMINATION TO ACQUIRE SUCH PROPERTY.

1963 Md. Laws, Chap. 52.

### 2.

Keeping in mind that the Legislature intended to liberalize fair market value, including allowing compensation for the problems identified in the study, we conclude that inclusion of the foregoing language was intended to allow compensation for demonstrable damages occurring as the result of the condemnor's conduct during the pre-condemnation period. The SHA argues, however, that because the loss of rental value is not a "diminution in value," Reichs Ford is not entitled to recover such damages in any event.

Diminution in value is defined generally as the act or process of decreasing, lessening, or taking away. Black's Law Dictionary 490 (8th ed.2004). The diminution in value typically is calculated based on the reduction in market value that is

caused by the public project. *Id.* When a tenant vacates a property, the property's market value is reduced as well as the value of the property to the owner. *See Bern–Shaw Ltd. P'ship v. Mayor of Balt.*, 377 Md. 277, 300, 833 A.2d 502, 515 (2003) (finding that, in a "quick-take" action where the vacating tenants had caused a great deal of destruction to the property while moving out, allowing the jury to see the property in that condition was prejudicial to its determination of "just compensation"). Not only will the property likely sell for less in an open market, it may become a millstone around the neck of the property owner, constantly causing the expenditure of funds with little or no return on investment. Report of the Legislative Council Committee, *supra*, at 281; 1963 Md. Laws, Chap. 52 (noting that, when tenants vacate, the property may lie idle before condemnation and become subject to vandalism and other problems). In keeping with the stated goal of just compensation, to place the property owner in as good a financial position as if eminent domain had never happened, it follows that fair market value, as contemplated by the definition provided by the Legislature, includes related lost rental income.[9] We conclude, therefore, that the Legislature intended to compensate property owners for a wide range of detrimental effects that the exercise (or threatened exercise) of eminent domain might have, including those categories

---

**9.** The SHA relies on *Solko v. State Roads Comm'n*, 82 Md.App. 137, 152, 570 A.2d 373, 380 (1990), to support its contention that Reichs Ford is not entitled to lost rents. In *Solko*, the court held that litigation expenses were not compensable as part of an award of just compensation. *Id* at 152, 570 A.2d at 380. The intermediate appellate court reasoned that, because such damages were not contemplated in the eminent domain statute, the Legislature did not intend to compensate property owners for such damages. *Id.* at 152, 570 A.2d at 380 In *Solko*, however, the property owner was arguing for compensation for litigation expenses, which, while arguably constituting damages related to the condemnation proceeding, have no relation to the damages caused directly to the property taken in the condemnation. *Id.* at 153, 570 A.2d at 380. Here, Reichs Ford seeks damages relating to loss of value to its property, *i e.*, lost rental value, unlike in *Solko*, where the property owner sought damages relating to litigation regarding the property, not damages to the property itself. *Id.* at 153, 570 A.2d at 380.

of damages apparently sought by Reichs Ford in this case, from the time that the governmental body or agency vested with the taking power decides to take the specific property until the date of the actual taking.[10] Under the statutory scheme of § 12–105, any compensable damages resulting during the period prior to a formal condemnation ordinarily should be considered and awarded, where appropriate, in the condemnation action.

In the instant case, Reichs Ford claims to have suffered nearly the same types of damages the General Assembly foresaw. After the public project was announced and remained pending, the tenant vacated the property, creating a situation in which Reichs Ford claims it suffered a loss in rental income, the payment of continuing real property taxes, mortgage interest, insurance, and other costs associated with maintaining the property. Although Reichs Ford here is claiming only for the period of time between the end of the tenant's initial lease term and the formal initiation of the eminent domain action in 2001, the lapse of time between the announcement of the public project and the ultimate condemnation was considerable, almost fourteen years.

Including in the concept of "just compensation" the recovery of lost rents and other damages to an interest in the real property prior to the actual condemnation supports the Legislature's intention of liberalizing the definition of fair market value and protecting property owners by creating an incentive for the State expeditiously to resolve or prosecute condemnation proceedings rather than, as in this case, possibly dragging

---

**10.** In *United Five and Ten Cent Stores*, 250 Md. 361, 243 A.2d 521 (1968), we considered the statutory language at issue here, not relating to what damages were compensable, but rather, when damages began to accrue. We found that, pursuant to the language regarding public announcements that proximately cause diminution in value, all diminution in value from the earliest public announcement or specific determination to take a specific property is compensable under § 12–105. *Id.* at 369, 243 A.2d at 525. In this case, however, we need not reach the issue of when the earliest public announcement or specific determination occurred because Reichs Ford is only claiming damages from the date of the failure of Griffith to exercise its option to extend its lease.

its feet. If lost rental value and other related damages are not recoverable, it might encourage a condemning authority simply to extend, without justification, the "encumbering" period prior to condemnation. *Dodson,* 294 Md. at 506, 451 A.2d at 326 (noting that the independent recovery for delay was used to imposed some sort of sanction for arbitrary and capricious acts by the condemnor).

We also conclude that combining a claim for damages from a temporary taking with the ultimate condemnation action is supported by principles of judicial economy. This would be consistent with the Legislature's intent in enacting § 12–105 to include all possible damages caused by public announcements regarding public projects in the assessment of fair market value at the time of the ultimate taking. *See Id.* at 505, 451 A.2d at 325 (observing that, at common law, if a landowner receives just compensation for the actual value of his property, he or she would have to sue separately in tort for damages related to unreasonable delay in payment of just compensation). The actual value of vacant property that cannot be rented or put to any other economically viable use is usually far lower than property that can be used in productive ways. Similarly, the longer a property continues to stand idle, the more speculative the diminution in value becomes, especially if possible rental income cannot be taken into account when determining the award. Not allowing the condemnee to receive other real property damages incidental to the condemnation creates undesirable and potentially significant transaction costs that may defeat the purpose of just compensation. In the present case, however, we have an unusual situation to which we must apply our determination that ordinarily precondemnation damage claims should be subsumed in the "fairmarket value" awarded in the ensuing eminent domain proceeding. Reichs Ford agreed to an award of "fair market value" for its property in the condemnation action, without limitation or qualification expressed in the Agreed Inquisition. Ordinarily, that would mean that it received all that it was entitled to under § 12–105, including the damages claimed in the inverse condemnation action. Yet, extenuating circum-

stances were suggested at oral argument [11] and in this record that may justify allowing Reichs Ford to pursue its "inverse condemnation" claims in the present litigation.

## IV.

Equitable estoppel is comprised of three basic elements: 1) a voluntary representation of one party, 2) that is relied on by the other party, 3) to the other party's detriment. *Creveling v. Gov't Employees Ins. Co.,* 376 Md. 72, 102, 828 A.2d 229, 247 (2003). The party attempting to prove estoppel bears the burden of adducing facts that support its contention. *Cunninghame v. Cunninghame,* 364 Md. 266, 289, 772 A.2d 1188, 1202 (2001). The record contains a letter, dated 19 June

---

11. During Petitioner's initial oral argument before us, the following colloquy occurred:

Petitioner's Counsel: We're here today because we believe that the decision [of the trial court] was wrong for two reasons. Legally, it was wrong because it deprived the owner of the property, the full entitlement to fair and just compensation that it deserves under the Constitution of the United States and the Constitution of Maryland. It was also wrong factually, because of the agreement of the parties and the understanding they reached prior to trial that they would litigate separately the issues of inverse condemnation from the question of fair market value.

Court: Are you suggesting that that agreement somehow waived their right to raise this defense?

Petitioner's Counsel: Does it waive their ... Yes. We believe there is an estoppel argument here.

Court: Why? If they say you can litigate this if you want that doesn't mean we'll fall on our sword.

Petitioner's Counsel: It was the understanding of the parties that the issue would be tried before the court. We never got that far because they raised the issue you can try the case but you can't offer any testimony as to damages and [that] eviscerates the case.

Court: Well the motion in limine was a device to raise this issue, to test it. I mean they presumably could have done that with some other dispositive motion as well could they not?

Petitioner's Counsel: They could. They raised the issue, the same issue before the same judge about a week earlier in a motion for summary judgment. [The trial judge] heard all of the arguments and denied that motion. Thus we were fully prepared for trial and ready to go forward. The motion in limine at the outset of the case sent us home much quicker than anticipated.

2001, from the SHA's attorney to Reichs Ford's counsel relating, in pertinent part:

> After our conversation today, I spoke to my clients, [ ]. I explained that you gave me two alternative proposals. The first was that we would settle both cases with an Agreed Inquisition in the amount of $1,525,000 inclusive of prejudgment interest and the second was that you would execute an Agreed Inquisition in the amount o $1,325,000 inclusive of prejudgment interest though would settle ONLY the condemnation action and that you would continue to litigate your claims of inverse condemnation related to this action.
>
> My client has given me the authority to accept your second proposal. SHA agrees that it will execute an Agreed Inquisition in the amount of $1,325,000 inclusive of prejudgment interest and that you will continue to litigate your claims of inverse condemnation.

The Agreed Inquisition executed and filed in the condemnation proceeding was for the amount of $1,325,000. No mention of the pending inverse condemnation suit or claim appears in the Agreed Inquisition; however, there also is in this record indication that the SHA was made aware at intervals by Reichs Ford, over the course of time between the termination of Griffith's lease and initiation of the formal condemnation action, of the mounting claimed pre-condemnation damages. How this state of affairs affects the SHA's ability to claim now that Reichs Ford received everything to which it was entitled under § 12–105 in the eminent domain action may require some fact-finding which, in the first instance, is committed to the fact-finder. This may be considered by the trial court on remand. We express no opinion whether, as a matter of law, estoppel may be applied against the SHA in this matter in any event, leaving that to the parties to address more fully on remand.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AND REMAND THE CASE TO THAT COURT FOR FURTHER

PROCEEDINGS; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY THE STATE OF MARYLAND.