907 A.2d 153

**COLLEGE BOWL, INC.**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

**No. 127, Sept. Term, 2005.**

Court of Appeals of Maryland.

Aug. 31, 2006.

Reconsideration Denied Oct. 11, 2006.

John C. Murphy, Baltimore, on brief, James L. Thompson (Miller, Miller & Canby, Rockville), for petitioner.

James R. Benjamin, Jr., Asst. City Solicitor (Ralph S. Tyler, City Solicitor, Andrew G. Bailey, Principal Counsel, Baltimore City Dept. of Law, on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

In this lawsuit, petitioner, College Bowl, Inc., a manufacturer of sports apparel, claims that it lost its tenancy and was

forced to relocate its business due to insistence by Baltimore City that petitioner's landlord redevelop the building in which petitioner's business was located and threats by the City to condemn the building if that was not done. The issue before us is whether the Circuit Court for Baltimore City erred in concluding, through a grant of summary judgment, that the City was not required to reimburse petitioner for relocation expenses and was not liable in damages for inverse condemnation of petitioner's leasehold interest. We agree with the Court of Special Appeals that there was no error.

Petitioner was a month-to-month commercial tenant in what is known as the Abell Building in Baltimore City. The six-story building, built in 1878 as a warehouse, is situated in an area that the City became anxious to redevelop and that was, indeed, included in an adopted urban renewal plan. As far back as 1997, the owner of the building—the David and Annie E. Abrams Realty Corporation (Abrams)—commenced preliminary discussions with the City and began to explore development options. In 2000, Abrams obtained zoning approval to construct 40 dwelling units in five of the six stories, including the one occupied by petitioner. When little or no renovation was actually forthcoming, however, the City, in 2002, began to press Abrams to commence acceptable redevelopment and, at various times thereafter, expressed the intent, in default thereof, to obtain authority to condemn the structure. In June, 2002, the City Administration included the property in an ordinance (Council Bill 823) that would have permitted the City to acquire 37 properties in the renewal area through condemnation.

On November 1, 2002, while the bill was pending before the City Council, Abrams notified petitioner of its intent to end the landlord-tenant relationship, and, on February 28, 2003, gave written notice of termination of the month-to-month lease effective April 30, 2003. The notice made no reference to any activities by the City. In March, at least a month prior to the termination, petitioner vacated the premises and relocated its business. Council Bill 823 was not enacted until March, 2004—a year after petitioner moved—and the City never did

exercise its authority to acquire the building. After petitioner vacated, Abrams made more intensive efforts to redevelop the structure and eventually, we are informed, sold it.

In April, 2003, just after vacating, petitioner filed this action seeking from the City compensation for relocation expenses, damages for inverse condemnation, and damages under 42 U.S.C. § 1983 for a taking of petitioner's property, and seeking from three other defendants—Baltimore Development Corporation (BDC) and two of its officials—damages for tortious conduct. The tort claims were dismissed on motion and are no longer at issue. The claims against the City were resolved on summary judgment. On petitioner's appeal, the Court of Special Appeals affirmed, holding that, because petitioner's tenancy was terminated by the landlord and not in response to any governmental action by the City, petitioner was not a "displaced person" entitled to relocation compensation and its property interest had not been taken by the City.

## DISCUSSION

### Statutory Relocation Compensation

Maryland Code, § 12–205 of the Real Property Article, requires a "displacing agency" to compensate a "displaced person" for certain expenses incurred as a result of the displacing agency's acquisition or written notice of intent to acquire the displaced person's property. Section 12–205(a) provides, in pertinent part:

"Whenever a program or project undertaken by a displacing agency will result in the displacement of any person, the displacing agency shall make a payment *to the displaced person*, on proper application as approved by the displacing agency for:

(1) Actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property;

(2) Actual direct loss of tangible personal property as a result of moving or discontinuing a business or farm operation [subject to a certain maximum];

(3) Actual reasonable expenses in searching for a replacement business or farm; and

(4) Actual reasonable expenses necessary to reestablish a displaced ... small business at its new site [subject to a certain maximum]."

(Emphasis added).

 The key issue with respect to petitioner's entitlement to compensation under that statute is whether it qualifies as a "displaced person." That term is defined in § 12–201(e), in relevant part, as any person who moves from real property, or moves his personal property from real property (1) *"[a]s a direct result* of written notice of intent to acquire or the acquisition of such real property in whole or in part by a displacing agency ..." or (2) on which that person conducts a small business and *"the head of the displacing agency* determines that displacement is permanent, *as a direct result* of rehabilitation, demolition, or other displacing activity...." (Emphasis added). In light of that definition, and given that the City never did acquire the property, the critical question is whether petitioner's displacement was a "direct result" of either a written notice of intent by the City to acquire the property or a determination by the head of the "displacing agency" that petitioner's displacement would be permanent as a direct result of rehabilitation, demolition, or other displacing activity.[1]

---

1. Petitioner suggests that Abrams acted as an "instrumentality" of the City and may itself qualify as a displacing agency. The term "displacing agency" is defined in § 12–201(f) as "any public or private agency or person carrying out: (1) A program or project with federal financial assistance; (2) A public works program or project with State financial assistance; or (3) Acquisition by eminent domain or by negotiation." Petitioner's argument in this regard is not well-developed, and the simple answer to it is that there was no evidence that Abrams received any Federal or State financial assistance or that it was carrying out any "[a]cquisition by eminent domain or by negotiation." We need not consider here whether circumstances could exist in which a landlord might qualify as an instrumentality of a public agency intent on acquiring the structure, because even if so, this would not be one of them. There is nothing in this record to indicate that, when Abrams terminated petitioner's month-to-month lease in February, 2003, having given

For purposes of summary judgment, the material factual allegations offered in connection with the motion and all reasonable inferences from those averments must be taken in a light most favorable to petitioner. Considerable discovery was undertaken in this case, and the factual record developed through that process was before the court when it considered the City's motion for summary judgment. We need not recount it all. Suffice it to say that, beginning at least in 2000, the City, through BDC and some of its officials, placed increasing pressure on Abrams to redevelop the Abell Building in conformance with the general redevelopment plan for that area of the City, including expressions of its intent to seek authority to condemn the building if that were not done. Consistent with those expressions, the City Administration included the building in the list of 37 structures for which it sought condemnation authority in Council Bill 823, introduced into the City Council in June, 2002.

Although we may fairly assume that, had Abrams done nothing more, the City likely would have condemned the property once Council Bill 823 was enacted, things never got to that point. Petitioner was actually forced to relocate and move its personal property because of the termination of its tenancy by Abrams in February, 2003, but it would be too simplistic to stop the inquiry there. The question appropriately raised by petitioner is whether Abrams was forced to act because of conduct by the City that would suffice to make petitioner a "displaced person" within the meaning of § 12–201(e).

It is undisputed, of course, that the City never did acquire the property, either by condemnation or through negotiations conducted under the threat of condemnation. Petitioner's complaint is that the City effectively forced Abrams to terminate petitioner's lease by threatening, both orally and in writing, to condemn the property unless Abrams proceeded

---

prior notice in November, 2002 of its intent to do so, it was acting as an agent or instrumentality of the City. It would not, therefore, qualify as a displacing agency.

with redevelopment activities that would necessitate termination of the tenancy, and that the City had no authority to make such threats. Its argument, in this regard, is that "[t]he City had no authority to inform the property owner that eminent domain authority would be obtained and exercised unless the building was renewed." Whether the City did possessed "authority" to make that threat is not the issue. The issue, in terms of compensation for relocation expenses, is, and remains, whether petitioner's relocation was the "direct result" of conduct specified in § 12–201(e), authorized or unauthorized. It clearly was not.

As we have observed, Abrams made some efforts on its own to renovate the building, including a successful pursuit of zoning authority to convert five floors of the building to residential use, and, in February, 2003, presumably in furtherance of those efforts, it terminated the month-to-month tenancy. That termination, by the landlord, occurred more than a year before Council Bill 823 was enacted and thus more than a year before the City had any legal authority to acquire the building through the exercise of eminent domain. There is simply no evidence that termination of the tenancy was the "direct result" of a written notice by the City of its intent to acquire the property or a determination *by the head of a displacing agency* that petitioner's displacement was permanent as a direct result of rehabilitation, demolition, or other displacing activity. *See Dugger v. City of Missoula,* 676 F.Supp. 209 (D.Mont.1987) (decided under Federal relocation assistance law, 42 U.S.C. § 4601 *et seq.*), and *cf. Pete v. State,* 384 Md. 47, 58–61, 862 A.2d 419, 425–27 (2004), in which we gave a restrictive meaning to the term "direct result" in the context of the statute allowing restitution for losses sustained by a victim as a "direct result" of the crime.

### Inverse Condemnation

Petitioner's claim of inverse condemnation rests largely on the same argument made with respect to relocation compensation. Petitioner points out that, if the City had actually condemned the Abell building in order to implement its urban

renewal plan, it would have been required to pay compensation to petitioner. It argues that the City cannot escape that obligation by unlawfully using the threat of condemnation to force the landlord to undertake its own redevelopment of the building. That conduct, petitioner contends, constitutes a "taking" of its property in the form of an inverse condemnation.

In *United States v. Clarke,* 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373, 377 (1980), the Supreme Court characterized an inverse condemnation as "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." In that regard, the Court adopted the view of D. Hagman, URBAN PLANNING AND LAND DEVELOPMENT CONTROL LAW 328 (1971) that "[i]nverse condemnation is 'a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.' " *Id.* See also *Reichs Ford v. State Roads,* 388 Md. 500, 511, 880 A.2d 307, 313 (2005). In determining whether governmental action constitutes an inverse taking, the Supreme Court has looked to whether the restriction "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741, 753 (1980), quoting from *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554, 1561 (1960).

Because it is in the nature of a generic description, an inverse condemnation can take many different forms—the denial by a governmental agency of access to one's property, regulatory actions that effectively deny an owner the physical or economically viable use of the property, conduct that causes a physical invasion of the property, hanging a credible and prolonged threat of condemnation over the property in a way that significantly diminishes its value, or, closer in point here, conduct that effectively forces an owner to sell. *Amen v. City*

*of Dearborn,* 718 F.2d 789 (6th Cir.1983) illustrates the last of those types. It was a class action based on inverse condemnation against the city of Dearborn, Michigan, by former residents of certain neighborhoods in the city. In order to coerce residents into selling their homes to the city, the city denied or unreasonably delayed building and repair permits or demanded expensive renovations as a condition to receiving a permit, demanded that residents perform maintenance and repairs not required by the building code, publicly announced that the area would be cleared and thereby inhibited residents from selling their homes to others, and allowed properties in the area to remain vacant and unprotected. The court concluded that, while none of those actions alone might have sufficed, the aggregate of that conduct did result in a taking.

Petitioner relies on *Amen* as supporting its claim that the City's conduct in this case constituted a taking of its property. There is no comparison. We observed in *Maryland Port Admin. v. QC Corp.,* 310 Md. 379, 402, 529 A.2d 829, 840 (1987) that a taking in a Constitutional sense "requires a high degree of interference with the use of the property." In *Amen,* there *was* that requisite degree of interference. Similarly, in *Reichs Ford, supra,* 388 Md. 500, 880 A.2d 307, the State informed the owner and a tenant directly that it intended to condemn the property, as a result of which the tenant decided not to renew its lease and the landlord was unable to re-lease the property.

The problem for petitioner lies less with the legal principles it espouses than with the fact that it has not shown, even for summary judgment purposes, that any conduct by the City caused the termination of its tenancy. The threat of condemnation here was always a contingent or conditional one. The City was looking to have the property renovated in accordance with the area urban renewal plan, preferably by Abrams. Acquisition of the property was never the City's primary objective. At least six years before the month-to-month tenancy was terminated and five years before the ordinance permitting condemnation was even introduced, Abrams was

itself pursuing re-development options that would, inevitably, have resulted in termination of petitioner's lease. There was no taking.

**JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.**