*Gail B. Litz v. Maryland Department of the Environment, et al.*, No. 23, September Term, 2015. Opinion by Harrell, J.

**EMINENT DOMAIN – INVERSE CONDEMNATION**

"Inverse condemnation" is a shorthand description of an action by which a landowner seeks just compensation for a taking of his or her property in the absence of formal condemnation proceedings. *See Coll. Bowl, Inc. v. Mayor & City Council Of Baltimore*, 394 Md. 482, 489, 907 A.2d 153, 157 (2006). It is possible for a plaintiff to state a claim for inverse condemnation by pleading governmental inaction in the face of an affirmative duty to act.

**EMINENT DOMAIN – INVERSE CONDEMNATION – MARYLAND AND LOCAL GOVERNMENT TORT CLAIMS ACTS**

Inverse condemnation is a constitutional claim requiring just compensation as a remedy. It is not covered under the Local Government Tort Claims or Maryland Tort Claims Acts. Similar to the eminent domain provisions under the Fifth and Fourteenth Amendments to the United States Constitution, Article III, section 40 of the Maryland Constitution does not provide sovereign immunity to state or local governments for an unconstitutional taking.

**TORTS – TRESPASS – LOCAL GOVERNMENT TORT CLAIMS ACT**

Trespass is a tort covered by the Local Government Tort Claims Act and subject to the LGTCA's notice requirements.

Circuit Court for Caroline County
Case No. 05-C-10-013616

Argued: November 9, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 23

SEPTEMBER TERM, 2015

GAIL B. LITZ

v.

MARYLAND DEPARTMENT OF THE
ENVIRONMENT, et al.,

Barbera, C.J.,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,
Harrell, Glenn T., Jr. (Retired, Specially
Assigned),
JJ.

Opinion by Harrell, J.
Battaglia, McDonald and Watts, JJ.,
concur and dissent.

Filed: January 22, 2016

"The nine most terrifying words in the English language are, 'I'm from the government and I'm here to help.'"

-Ronald Reagan, 40th President of the United States, News Conference (12 August 1986).

Petitioner, Gail B. Litz, might have welcomed hearing those nine words spoken to her, but, according to her Third Amended Complaint, they were not forthcoming. In this litigation, Ms. Litz makes a second appearance before this Court regarding a parcel of real property (containing a lake) in Caroline County, Maryland, that was contaminated allegedly by run-off from failed septic systems serving homes and businesses in the Town of Goldsboro. The human sewage seeped out of the septic fields into ground and surface water flowing into drainage swales, which drained into streams flowing into Ms. Litz's lake. Ms. Litz operated a popular lake-front recreational campground on her property in Goldsboro. Unable to operate the campground because of the pollution to her lake, Ms. Litz lost the property through foreclosure by the bank holding the mortgage.

She filed a complaint in the Circuit Court for Caroline County. After two prior trips to the Court of Special Appeals and one to this Court, Ms. Litz's remaining claims against Respondents, the State of Maryland, the Maryland Department of the Environment ("MDE"), the Department of Health and Mental Hygiene (in the guise of the Caroline County Health Department) (collectively referred to in this opinion sometimes as the "State" or the "State Respondents"), and the Town of Goldsboro, the case reaches us for the second time regarding her claims of inverse condemnation against all Respondents and trespass against the Town. We issued a writ of certiorari to consider questions regarding Ms. Litz's relative success in stating these claims and the

applicability of the Local Government Tort Claims Act and the Maryland Tort Claims Act. After determining in our first encounter with this litigation that Ms. Litz filed suit within applicable statutes of limitations, we hold now that, at the preliminary motion stage of the litigation, Ms. Litz provided sufficient factual averments to state claims for inverse condemnation against Respondents.[1]

## ALLEGATIONS IN THE THIRD AMENDED COMPLAINT[2]

The 140 acre Litz property is located in the Town of Goldsboro in Caroline County, Maryland. When Ms. Litz's parents purchased the property in 1948, it contained a pond and grist mill. The Litz family constructed a dam in the mid-1950s to create originally a 28-acre lake, known as "Lake Bonnie," to assist with irrigation of the fields. The Litz family opened also a recreational campground business on the property, which had campsites, swimming, fishing, and boating – centered around Lake Bonnie. Ms. Litz inherited the property in 2001 and became the owner of the campground business. It was her "intention and expectation that she would continue to own and operate the Campground as her primary occupation and source of income."

---

[1] The issue of whether Ms. Litz stated adequately a claim for trespass against the Town is not at issue before this Court. The issue was raised only in the Town of Goldsboro's Petition for a Writ of Certiorari, which this Court denied.

[2] Our recitation of the "facts" (and reasonable inferences drawn therefrom favorable to Ms. Litz) come purely from Ms. Litz's Third Amended Complaint. We will focus exclusively on those allegations that relate to the questions for which we granted certiorari.

Lake Bonnie "receives its water from two local streams, the Oldtown Branch and the Broadway Branch, and [the lake] discharges a constant overflow of water [through a spillway] directly into the Choptank River," a tributary of the Chesapeake Bay. Because Goldsboro was a small town[3], there was no public water or sewer service available. The residents and businesses in the Town relied on individual wells and septic systems. Both of the local streams receive groundwater and surface water from roads maintained by the Maryland State Highway Administration and flow into Lake Bonnie. Two local drainage associations[4] were created along these streams. The municipal surface water open drainage collection system flows also into the streams and ultimately into Lake Bonnie.

As time passed, the septic systems within the Town began to fail, the septic fields overflowed into the open drainage system, and contaminated the two streams, which led to the contamination of Lake Bonnie. Following failed attempts to fix the problem in the 1970s, the Caroline County Health Department conducted studies in the 1980s.[5] A study conducted in 1985 by Lester A. Coble, Jr., then Director of the Caroline County

---

[3] According to the Third Amended Complaint, the population of Goldsboro in 2000, was 216 people.

[4] Drainage associations "are networks of drainage ditches that drain the local fields, and are funded by a mixture of federal, state, and local money. The PDAs have also been informally used as storm water drainage systems for the Town, and have been used to remove waste water from the Town."

[5] According to Ms. Litz's allegations, the Caroline County Health Department, a State agency for present purposes, "had the legal responsibility to review applications for septic systems, where appropriate issue permits for septic systems, and conduct inspections of the septic systems."

Department of Health, "found that between 70% and 80% of the Town had at least one of the three following problems: (1) confirmed sewage pits; (2) raw sewage or waste water; or (3) shallow wells less than one hundred feet or deep wells less than fifty feet from a source of contamination."

By 1988, the Caroline County Health Department reported to the Maryland Department of the Environment that the shallow wells tested in Goldsboro contained "elevated levels of fecal coliform," i.e., pathogens found in human bodily waste. On 18 September 1995, the Caroline County Health Department concluded that the "use of the stormwater management system in the Town as a sewage system has gotten to crisis proportions." A 1 December 1995 letter from the Maryland Department of the Environment stated that "[t]here are actual water quality impacts on Lake Bonnie. . . It now appears that the situation has deteriorated and created environmental concerns that will need to be addressed."

On 8 August 1996, MDE and Goldsboro's then-Mayor William H. Bartin signed an administrative consent order which "explain[ed] the problems, order[ed] Goldsboro to take certain actions, impose[d] mandatory reporting obligations and specifie[d] penalties for non-compliance." Some of the specific requirements of the agreement between MDE and Goldsboro included:

> 1. Within 60 days . . . (Goldsboro will) identify the private sewage disposal systems located in and around Goldsboro which are discharging pollutants to surface or ground water . . .
>
> 2. By October 30, 1996, complete a study to identify and characterize the construction of a public sewer system. . .

4

3. By January 1, 1997, submit (to MDE) for review and approval a plan and schedule. . . for construction of a public sewer system (the "Compliance Plan")

4. Within 30 days of approval of the Compliance Plan, begin implementation of the Compliance Plan.

Meeting the timetable and remedies contemplated by this Consent Order did not come to pass.

In 2004, the Caroline County Health Department issued warnings to multiple towns, including Goldsboro, about issuing additional building permits for areas with water and sewage concerns. Even with these warnings, "the Town has failed to comply with any of the material terms of the Consent Order and MDE has enforced no part of it."

Because Lake Bonnie was being polluted continually by the pollutants in the water flowing through the drainage system into the Oldtown Branch and the Broadway Branch and then into Lake Bonnie, Ms. Litz alleges that "the campground has been destroyed, and Litz's property has been substantially devalued," which left her "unable to pay the mortgage on the Litz property because the campground was generating no income." A foreclosure action resulted and the property was sold to Provident State Bank on 14 May 2010 for $364,000.

## PROCEDURAL HISTORY

Ms. Litz's original complaint, filed on 8 March 2010, sought a permanent injunction and alleged negligence, trespass, private and public nuisance, and inverse condemnation against the Town of Goldsboro and Caroline County (the Health

5

Department[6]) and negligence and inverse condemnation against MDE. An amendment later added a count for mandamus or equitable relief under the Environmental Standing Act. Ms. Litz's second amended complaint added the Department of Health and Mental Hygiene ("DHMH") and the State of Maryland as defendants, seeking a permanent injunction and alleging negligence, trespass, private and public nuisance, and inverse condemnation against the newly added defendants.

On 13 September 2010, a hearing was conducted in the Circuit Court on motions to dismiss (based on a host of defenses, including applicable statutes of limitation) filed by MDE, DHMH, the State, the County, and Goldsboro. The Circuit Court granted the motions to dismiss as to all defendants[7], save the Town, reserving ruling as to the Town to allow for a response to be filed. On 22 September 2010, Ms. Litz filed a Motion for Reconsideration in the Circuit Court and, a few days later, filed her opposition to Goldsboro's Motion to Dismiss. On the same day, Ms. Litz filed her Third Amended Complaint, which added some factual allegations, but stated no additional claims.

The trial judge denied Ms. Litz's Motion for Reconsideration and dismissed her claims against all of the defendants, with prejudice and without leave to amend. Ms. Litz

---

[6] "[A]ny claim against the County would be against the County Health Department, which was for the purposes of the present case a State agency." *Litz v. Maryland Dep't of Env't,* 434 Md. 623, 634, 76 A.3d 1076, 1082 (2013) (hereinafter "*Litz I*").

[7] On the record, the Circuit Court "dismissed all counts against the State defendants on the ground that the State was protected by sovereign immunity and [Ms.] Litz failed to comply with the requirements of the Maryland Tort Claims Act." *Litz I,* 434 Md. at 634, 76 A.3d at 1082.

appealed to the Court of Special Appeals[8], which affirmed, in an unreported opinion, the Circuit Court's dismissal based on its narrow conclusion that Ms. Litz's claims were barred by the relevant statutes of limitation.

We granted Ms. Litz's first Petition for Certiorari, *Litz v. Maryland Dep't of Env't,* 429 Md. 81, 54 A.3d 759 (2012). We concluded ultimately that "it was error to affirm the grant of the motions to dismiss Litz's causes of action for negligence, trespass, and inverse condemnation on the grounds of limitations, but we affirm the judgments of the Circuit Court and the intermediate appellate court in dismissing Litz's nuisance counts." *Litz v. Maryland Dep't of Env't,* 434 Md. 623, 642, 76 A.3d 1076, 1087 (2013) (hereinafter "*Litz I*"). We remanded the case to the Court of Special Appeals to conduct a review of the other arguments advanced by the governmental defendants for why Ms. Litz's suit should be dismissed totally.

On remand, the Court of Special Appeals reviewed the legal sufficiency of Ms. Litz's remaining tort and inverse condemnation claims, the applicability and satisfaction of the notice requirements under the Maryland Tort Claims Act ("MTCA") and Local Government Tort Claims Act ("LGTCA"), and the defense of governmental immunity. In an unreported opinion, the intermediate appellate court concluded that Ms. Litz failed

---

[8] In her brief filed with the Court of Special Appeals, Ms. Litz did not appeal the dismissal of her tort claims (trespass and negligence) against the State or the Environmental Standing Act claim against the MDE, leaving only the inverse condemnation claims against these defendants. She appealed the dismissal of her claims for negligence, nuisance, trespass, and inverse condemnation against the Town.

7

to state an inverse condemnation claim against the State[9], reasoning that "[a]t most, MDE [and the other State entities] can be charged with discretionary inaction, which would not support a taking claim." Ultimately, the Court of Special Appeals held "that the circuit court properly dismissed the State and its agencies from the case," but that it was "error to dismiss the negligence, trespass and inverse condemnation claims against the Town." At the conclusion of the intermediate appellate court's second review, Ms. Litz's remaining causes of actions included only those three claims against the Town.

Ms. Litz filed her second Petition for Writ of Certiorari with this Court, which we granted, *Litz v. Maryland Dep't of the Env't, et al.*, 442 Md. 515 (2015), to consider four questions, which we have reordered for organizational convenience:

> 1) Whether the Court of Special Appeals erred when it held that Petitioner failed to state a cause of action for inverse condemnation against the State government Respondents?
>
> 2) Whether an inverse condemnation claim comes within the notice requirements of the Maryland Tort Claims Act and the Local Government Tort Claims Act?
>
> 3) Whether the Court of Special Appeals exceeded the scope of this Court's remand order when it considered an issue disavowed expressly by Respondents, to wit, Petitioner's claim for inverse condemnation against the State government Respondents was subject to the Maryland Tort Claims Act?[10]

---

[9] As described previously, the State includes: the State of Maryland, DHMH, MDE, and the Caroline County Health Department, the latter acting as a State agency for purposes of this case.

[10] In our opinion, *Litz I*, 434 Md. at 657, 76 A.3d at 1095, we remanded the case to the Court of Special Appeals for further proceedings: "On remand, the intermediate appellate court shall have the opportunity to entertain any other arguments properly before the court." The question of whether the Court of Special Appeals exceeded the scope of our remand order was not briefed fully by all sides and we note that, under

(Continued…)

4) Whether a trespass claim is covered by the notice requirement of the Local Government Tort Claims Act?

We conclude that Ms. Litz stated adequately in her Third Amended Complaint a facial claim for inverse condemnation against Respondents. Moreover, a claim for inverse condemnation is not covered by the notice provisions of either tort claims act. We agree, however, with the intermediate appellate court's holding that the tort of trespass is covered by the notice requirement of the LGTCA. Thus, we reverse in part and affirm in part the judgment of the Court of Special Appeals, and remand with instructions to remand the case to the Circuit Court for Caroline County for further proceedings.

## STANDARD OF REVIEW

Because this case was disposed of by the Circuit Court through the grant of motions to dismiss, pursuant to Maryland Rule 2-322, our review of the sufficiency of the facts alleged is limited to the four corners of the relevant complaint, the Third Amended Complaint. We "accept all well-pled facts in the complaint, and reasonable inferences drawn from them, in a light most favorable to the non-moving party." *Converge Servs. Grp., LLC v. Curran*, 383 Md. 462, 475, 860 A.2d 871, 878-79 (2004). Thus, dismissal of a complaint "is proper only if the alleged facts and permissible inferences, so viewed,

---

(…continued)
Maryland Rule 8-131(a), it is within our discretion to decide an issue not raised below "if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." Thus, we will exercise our discretion to decide the issues, which we have determined are before us properly.

9

would, if proven, nonetheless fail to afford relief to the plaintiff." *Ricketts v. Ricketts*, 393 Md. 479, 492, 903 A.2d 857, 864 (2006) (citations omitted). We determine "whether the trial court was legally correct, examining solely the sufficiency of the pleading." *Ricketts*, 393 Md. at 492, 903 A.2d at 865 (citation omitted).

## DISCUSSION

### I. Inverse Condemnation

### a. Contentions

Ms. Litz contends that she alleged sufficiently a cause of action for inverse condemnation by alleging that the failure of Respondents to address the pollution and sewage problems led directly to the substantial devaluing of her property and its ultimate loss. She highlights this Court's prior opinion in which we stated that "a reasonable trier of fact could infer that Litz alleges two distinct takings: 1) the loss of the use and enjoyment of Lake Bonnie and the Campground; and (2) the foreclosure of her property in May 2010." *Litz I*, 434 Md. at 656, 76 A.3d at 1095. Ms. Litz argues further that these claims are not covered by the MTCA or the LGTCA because the claims are not torts, but rather unconstitutional takings. Because unconstitutional takings are pleaded, Ms. Litz maintains that the State (and its agencies) and the Town should not be able to avail themselves of the defense of governmental immunity.

The State Respondents posit that the lower courts dismissed properly Ms. Litz's inverse condemnation claim against them because her allegations did not reveal any affirmative act (regulatory or otherwise) by the State which led to a taking. Additionally, the State Respondents argue that any injury Ms. Litz suffered was the result of acts

10

caused by private third parties, i.e., the property owners in Goldsboro whose septic fields failed. Because Ms. Litz did not state sufficiently a claim for inverse condemnation, the State sees the issue of the applicability of the MTCA and the LGTCA as effectively moot. The Town takes a similar position on this issue, responding that Ms. Litz complained only that the Town had not enacted any regulation or taken effective action to stop the contamination caused by private citizens and, therefore, there was no governmental taking.

**b. Sufficiency of the Third Amended Complaint**

Article III, Section 40 of the Maryland Constitution provides: "The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation." Section 40 has been determined to "have the same meaning and effect in reference to an exaction of property, and that the decisions of the Supreme Court on the Fourteenth Amendment[11] are practically direct authorities." *Bureau of Mines of Maryland v. George's Creek Coal & Land Co.*, 272 Md. 143, 156, 321 A.2d 748, 755 (1974). Although this constitutional provision covers specifically eminent domain actions, it also grounds a cause of action that has come to be known as an inverse condemnation.

---

[11] "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

11

An inverse condemnation claim is characterized as "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *Coll. Bowl, Inc. v. Mayor & City Council Of Baltimore*, 394 Md. 482, 489, 907 A.2d 153, 157 (2006) (citing *United States v. Clarke,* 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373, 377 (1980)). Essentially, a plaintiff may "recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *Coll. Bowl, Inc.*, 394 Md. at 489, 907 A.2d at 157 (quoting D. Hagman, Urban Planning and Land Development Control Law 328 (1971)). The Supreme Court explains that a government is liable for inverse condemnation if it "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Coll. Bowl, Inc.*, 394 Md. at 489, 907 A.2d at 157 (citing *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741, 753 (1980)).

To state a claim for inverse condemnation, a plaintiff must allege facts showing ordinarily that the government action constituted a taking. Defining a "taking" for purposes of an inverse condemnation claim is a "fact-intensive" inquiry. The Supreme Court has explained that a plaintiff seeking to state a claim for inverse condemnation "bears a substantial burden" and must be able to show that "justice and fairness" entitle him or her to compensation. *Eastern Enters. v. Apfel*, 524 U.S. 498, 523, 118 S. Ct. 2131, 2146 (1998). Significant factors in the analysis include: "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the

character of the governmental action." *Eastern Enters.*, 524 U.S. at 523-24, 118 S. Ct. at 2146 (citations omitted). Accordingly, an inverse condemnation claim may arise ordinarily in multiple ways:

> [T]he denial by a governmental agency of access to one's property, regulatory actions that effectively deny an owner the physical or economically viable use of the property, conduct that causes a physical invasion of the property, hanging a credible and prolonged threat of condemnation over the property in a way that significantly diminishes its value, or, closer in point here, conduct that effectively forces an owner to sell.

*Coll. Bowl, Inc.*, 394 Md. at 489, 907 A.2d at 157.

A difficulty with Ms. Litz's claim of a "taking" fitting neatly within conventional thinking about inverse condemnation is that her allegations focus predominantly on the inaction of Respondents, rather than any affirmative action by those parties. There is no controlling Maryland law that we could find that sheds light on this wrinkle. Thus, we look outside our borders for guidance. Upon this review, it seems appropriate (and, in this case, fair and equitable, at least at the pleading stage of litigation) to recognize an inverse condemnation claim based on alleged "inaction" when one or more of the defendants has an affirmative duty to act under the circumstances. Therefore, we hold, as a matter of Maryland law, that an inverse condemnation claim is pleaded adequately where a plaintiff alleges a taking caused by a governmental entity's or entities' failure to act, in the face of an affirmative duty to act.

Our survey revealed that, in some states, unalloyed allegations of government inaction alone may suffice to plead adequately an inverse condemnation claim. For example, the language of the Minnesota Constitution provides that "[p]rivate property

13

shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minn. Const. Art. I, § 13. In application of this provision, the Minnesota courts follow a standard that "[a]n unconstitutional taking is a governmental action or *inaction* that deprives a landowner of all reasonable uses of its land." *Evenson v. City of St. Paul Bd. of Appeals*, 467 N.W.2d 363, 365 (Minn. Ct. App. 1991) (emphasis added).

In contrast, in South Carolina, a plaintiff brought a cause of action against the City of Greenville alleging that the city "improperly and negligently designed and maintained its municipal drainage system in the area where his business was located," which led to substantial damage to his business and property after heavy rains resulted in flooding. *Hawkins v. City of Greenville*, 594 S.E.2d 557, 560 (S.C. Ct. App. 2004). The South Carolina Court of Appeals concluded that the plaintiff could not state a claim for inverse condemnation by alleging only "failures to act." *Hawkins*, 594 S.E.2d at 562. The failure to act would not sustain a claim for inverse condemnation because the case law in South Carolina held: "To establish an inverse condemnation, a plaintiff must show: '(1) an *affirmative, positive, aggressive act* on the part of the governmental agency; (2) a taking; (3) the taking is for a public use; and (4) the taking has some degree of permanence.'" *Id.* (emphasis added). Of course, the major distinction between the Minnesota and South Carolina approaches is the specific requirement of the South Carolina case law requiring an "affirmative" act on the part of the government. This

14

requirement is more specific than found in Maryland case law and, thus, is not persuasive in our analysis of the present case.[12]

We find more persuasive cases which sanction a plaintiff advancing an inverse condemnation claim in the face of government inaction where the governmental agency had an affirmative duty to act under the particular circumstances. A case from a Florida District Court found that when a county failed to "reasonably maintain and repair Old A1A [a county-owned road] that it has effectively abandoned it, thereby depriving [the appellants] of access to their property without compensation[, it was] a cognizable claim." *Jordan v. St. Johns Cnty.*, 63 So. 3d 835, 839 (Fla. Dist. Ct. App. 2011). Old A1A had been subject over the years to considerable damage from storms and erosion. *Jordan*, 63 So. 3d at 837. The appellants owned property located in a subdivision accessible only by Old A1A because the subdivision was located on a barrier island. *Jordan*, 63 So. 3d at 836. The court concluded that "governmental inaction—in the face of an affirmative duty to act—can support a claim for inverse condemnation." *Jordan*, 63 So. 3d at 839. Because it was the county's responsibility to maintain this road and it failed to do so, the pleaded inaction supported maintenance of an inverse condemnation cause of action against the county.

---

[12] Similar to the Minnesota Constitution, the language of Maryland's eminent domain provision of the Maryland Constitution is general and broad: "The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation." Md. Const. Art. III, § 40.

The California appellate courts have held also that "in order to prove the type of governmental conduct that will support liability in inverse condemnation it is enough to show that the entity was aware of the risk posed by its public improvement and deliberately chose a course of action—or inaction—in the face of that known risk." *Arreola v. Cnty. of Monterey*, 122 Cal. Rptr. 2d 38, 55 (Cal. Ct. App. 2002), *as modified on denial of reh'g* (July 23, 2002). In *Arreola*, the county had been alerted by concerned property owners starting in 1977 about the potential failure of a river levee due to the weakening effects of a build-up of vegetation and the increased risk of resultant flooding. *Arreola*, 122 Cal. Rptr. 2d at 56. Monterey's actual knowledge of the maintenance problems and its ability to control the project, made it immaterial whether the county had "responsibility for operation of the project." *Arreola*, 122 Cal. Rptr. 2d at 69-72. In spite of its knowledge of the problem, the County "did not take any action to correct the situation until 1991 or later [and the] knowing failure to clear the Project channel, in the face of repeated warnings and complaints was" enough for an inverse condemnation claim after floods damaged the plaintiff's property. *Id.*

We find persuasive these cases. Within the Third Amended Complaint, Ms. Litz alleges that the Town had "undertaken [since at least 1973] the task of correcting its failing community sewage system." Her complaint includes allegations that, by 1985, the Town was informed of the results of a study conducted by the Caroline County Department of Health, which concluded that immediate action was necessary. These warnings continued between 1985 and 1996 before any purported affirmative "action" was taken, to wit, the Consent Order was executed. Additionally, Ms. Litz was notified

16

by a 12 June 1996 letter from the Caroline County Health Department that, because the sewage discharges had not been eliminated, Lake Bonnie continued to be a health threat. Even after the 1996 Consent Order was signed between MDE and the Town, Respondents failed to effect any changes to the sewage treatment or drainage systems in the Town. In 2004, the Caroline County Health Department distributed a warning to the Town regarding additional septic or building permits being approved.

The Court of Special Appeals referred to this situation as an overall "failure to regulate." The cases cited by the intermediate appellate court to support this characterization focused on interference with various types of property rights by third parties, which government failed to avert, mitigate, or cure.[13] Those cases are not persuasive here. Two of those cases involved assertions that the Federal Government had committed a taking because it failed to regulate conduct by third parties; however, the property interest at issue for each plaintiff was not a traditional in-fee property interest. *See Georgia Power Co. v. United States*, 633 F.2d 554, 555 (Ct. Cl. 1980) (company claimed a taking of its electrical powerline easement); *Alves v. United States*, 133 F.3d 1454, 1455-56 (Fed. Cir. 1998) (plaintiff "argued that the [Bureau of Land Management's] failure to contain the trespass [by others] constituted a Fifth Amendment taking and a breach of contract based on his interpretation of his grazing permits and/or an exchange-of-use agreement as contracts"). Neither of these cases resulted in a

---

[13] This endorsed the theory put forth by the State that any damage to Lake Bonnie and Ms. Litz's property was attributable to third-party, private property owners, not Respondents.

"taking" because the regulations imposed by the Federal Government were not meant to act as an "insurer that private citizens will act lawfully with respect to property subject to governmental regulation." *Alves*, 133 F.3d at 1458. Additionally, the courts determined that both of these situations were more like private tort actions, as opposed to an unconstitutional taking, because of the nature of the implicated property rights and the allegations advanced by the plaintiff.

The Town of Goldsboro relies on *Casey v. Mayor & City Council of Rockville*, 400 Md. 259, 929 A.2d 74 (2007), for the proposition that "[e]ssential to the successful assertion of any regulatory takings claim is a final and authoritative determination of the permitted and prohibited uses of a particular piece of property." *Casey*, 400 Md. at 308, 929 A.2d at 103-04; *but see Falls Rd. Cmty. Ass'n, Inc. v. Baltimore Cnty.*, 437 Md. 115, 142-44, 85 A.3d 185, 201-02 (2014) (even after there was a final administrative order and the county has the general duty and responsibility "to enforce land use and zoning requirements, it clearly does not pursue enforcement on every arguable violation"). Certainly we do not disagree with this statement from *Casey* in the context of the zoning action involved there, but we disagree with the Town's characterization of Ms. Litz's claim as being analogous. Our intermediate appellate court colleagues viewed Ms. Litz's claim as a "failure to regulate." Her claim was not expressed as a regulatory taking, such as a "down-zoning," which might require analysis under the *Casey* precedent.

Although the sewage was flowing from the failed septic systems of private citizens and/or businesses (which governmental entity approved the installation of the systems and whether the approvals were proper has yet to be explored in this case because

18

discovery has yet to occur), Ms. Litz alleges that the Town and the State were aware of the failure of the community sewage systems, the contamination of the surface and groundwater, and the conveyance of the sewage to Lake Bonnie via the community drainage system. It is not merely a case of a property right being affected adversely by private third parties solely and exclusively. Ms. Litz's property was alleged to have been "condemned" by the failure of the State and Town in the face of an affirmative duty to abate a known and longstanding public health hazard. Although questions of which Respondents had statutory or legal duties with regard to abatement of the contamination are open in the proceeding as far as it has advanced, it is not frivolous to hypothesize that state, county, and municipal agencies may have duties to step in to protect the public health, as illustrated by the execution of the 1996 Consent Order.

In *State Dep't of Env't v. Showell*, 316 Md. 259, 264, 558 A.2d 391, 393 (1989), this Court held that it was within the broad powers of the State Department of Health and Mental Hygiene to execute a consent order to protect the public health when it was clearly a "'reasonable remedial measure' executed within the authority of the Department to promote a legitimate governmental objective." These powers afforded to the Department to protect public health included:

> In respect to the scope of the Department's powers, § 9-204(a) of the Health-Environmental Article provides that "[t]he Secretary has general supervision and control over the waters of the State, insofar as their sanitary and physical condition affect the public health or comfort and may make and enforce rules and regulations and order works to be executed to correct and prevent their pollution." As to existing sewerage systems, the Secretary may "[c]ompel their operation in a manner that will protect the public health and comfort." § 9-204(b)(1).

19

*Showell*, 316 Md. at 270, 558 A.2d at 396 (alterations in original). Under the current version of the Environment Article of the Maryland Code, the State is empowered to step-in to ensure the enforcement of the Federal Water Pollution Control Act. *See* Maryland Code (1984, 2013 Repl. Vol.), Environment Article, § 9-253 ("Env't").

Even if, however, it is determined on remand that the State Respondents and the Town did not have a general or specific statutory duty to act to abate this public health hazard, Ms. Litz's allegations may be read to assert that execution of the Consent Order created an affirmative duty to act. Without discovery regarding the origins of and seeming failure to enforce the Consent Order and its terms, it was premature to resolve Ms. Litz's claim for inverse condemnation by the grant of the motions to dismiss. Moreover, at the current stage of these proceedings and given our holding here regarding governmental inaction as a basis for an inverse condemnation claim, the parties have not briefed or argued the applicable law under these circumstances.

Although we agree that Ms. Litz stated adequately a claim for inverse condemnation, we caution that our decision should not be seen by any party as either an unqualified victory or calamity. Ms. Litz may not succeed ultimately on her inverse condemnation claim against any or all of the Respondents. We conclude only that it was improper to decide as a matter of law, at the present stage of the litigation, that Ms. Litz failed to state a claim for inverse condemnation. Her entitlement to relief may become clearer or blurred after the respective sides have the opportunity to conduct discovery and argue the law of liability.

**c. Application of the LGTCA and the MTCA to an Inverse Condemnation Claim**

20

The LGTCA was created "to limit the designated local governments' financial liability as well as to provide the employees of local governments certain protections from damages." *Rounds v. Maryland-Nat. Capital Park & Planning Comm'n*, 441 Md. 621, 638, 109 A.3d 639, 648-49 (2015), *reconsideration denied* (Mar. 27, 2015). We conclude that the General Assembly did not intend to include a claim for inverse condemnation to come within the ambit of the provisions of either tort claims act.[14]

A claim for inverse condemnation is not a tort in a traditional sense and has been treated routinely and differently than torts. In *Reichs Ford Rd. Joint Venture v. State Roads Comm'n of the State Highway Admin.*, 388 Md. 500, 506 n.2, 880 A.2d 307, 310 n.2 (2005), the circuit court dismissed all of the plaintiff's tort claims for failure to follow the notice requirements of the MTCA. The plaintiff's inverse condemnation claim, however, was allowed to move forward, without the necessity of proof of compliance with the notice provision of the MTCA. *Id.*

---

[14] In *Rounds v. Maryland-Nat. Capital Park & Planning Comm'n*, 441 Md. 621, 643, 109 A.3d 639, 651-52 (2015), we explained:

> Nothing in the statute's language or its legislative history indicates that the General Assembly intended to exclude any category of tortious conduct committed by a local government or its employees, from the scope of the LGTCA notice requirement. As we have previously indicated, "[t]his Court has been most reluctant to recognize exceptions in a statute when there is no basis for the exceptions in the statutory language."

*See also Lee v. Cline*, 384 Md. 245, 256, 863 A.2d 297, 304 (2004) (holding that "[t]here are no exceptions in the statute for intentional torts or torts based upon violations of the Maryland Constitution. This Court has been most reluctant to recognize exceptions in a statute when there is no basis for the exceptions in the statutory language").

21

Additionally, it is well-established that "that agents of the State do not enjoy immunity with respect to a wrongful taking of property without just compensation." *Dep't of Nat. Res. v. Welsh*, 308 Md. 54, 60, 521 A.2d 313, 316 (1986). We have explained:

> . . . it would be strange indeed, in the face of the solemn constitutional guarantees, which place private property among the fundamental and indestructible rights of the citizen, if this principle could be extended and applied so as to preclude him from prosecuting an action. . . against a State Official unjustly and wrongfully withholding property.

*Lee v. Cline*, 384 Md. 245, 263, 863 A.2d 297, 308 (2004) (citation and quotations omitted). These constitutional guarantees require that state officials not be immune from suit because, as "expressed in Article 19 of the Maryland Declaration of Rights, that a plaintiff injured by unconstitutional state action should have a remedy to redress the wrong." *Lee*, 384 Md. at 264, 863 A.2d at 308. It is only logical that courts would treat eminent domain and inverse condemnation claims differently from common law or statutory torts because the remedy afforded to the respective plaintiff is different.

We have explained that "constitutionally speaking, fair market value is usually the only measure of damages in an eminent domain condemnation." *Reichs Ford Rd. Joint Venture*, 388 Md. at 513, 880 A.2d at 314 (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5–6, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765(1949)).[15] We have recognized "that

---

[15] Within the context of eminent domain and inverse condemnation proceedings, fair market value is defined as:

---

(Continued…)

22

applying the LGTCA damages cap to a constitutionally based taking, or inverse condemnation could conflict with a vested right to just compensation." *Espina v. Jackson*, 442 Md. 311, 332-33, 112 A.3d 442, 455 (2015) (citations and quotations omitted). This conflict arises because the eminent domain provision of the Maryland Constitution[16] creates "an implied contract between the government and a private landowner." *Widgeon v. E. Shore Hosp. Ctr.*, 300 Md. 520, 531, 479 A.2d 921, 926 (1984). This implied contract differs from the duty element of Maryland tort law. Because the remedy afforded to a plaintiff in the case of a taking is fair market value, the damages "cap" associated with the LGTCA and the MTCA should not apply. By parity of reasoning, the notice requirements of each tort claims act would not apply either.

(…continued)

> (b) The fair market value of property in a condemnation proceeding is the price as of the valuation date for the highest and best use of the property which a vendor, willing but not obligated to sell, would accept for the property, and which a purchaser, willing but not obligated to buy, would pay, excluding any increment in value proximately caused by the public project for which the property condemned is needed. In addition, fair market value includes any amount by which the price reflects a diminution in value occurring between the effective date of legislative authority for the acquisition of the property and the date of actual taking if the trier of facts finds that the diminution in value was proximately caused by the public project for which the property condemned is needed, or by announcements or acts of the plaintiff or its officials concerning the public project, and was beyond the reasonable control of the property owner.

Maryland Code (1974, 2003 Repl. Vol.), Real Property Article, § 12-105(b) ("RP").

[16] "The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation." Md. Constitution, Art III, § 40.

Therefore, we conclude that Ms. Litz's claim for inverse condemnation is not covered by the LGTCA or the MTCA, and especially their respective notice requirements.

## II. Trespass Claim against the Town of Goldsboro

Ms. Litz contends that the Court of Special Appeals erred by deciding that her trespass claim against Goldsboro was a tort subject to the LGTCA and its notice requirement. She relies on Maryland common law to argue that local governments should not be afforded immunity from a trespass claim. She contends further that the adoption of the LGTCA did not change the common law standard and, therefore, her trespass claim should not be subject to the LGTCA.

The Town responds that Ms. Litz did not assert an actual trespass claim against it, alleging only that the Town failed to stop a trespass by others. Because Ms. Litz did not allege that the Town committed a trespass, according to the Town, the issue of whether this claim is covered by the LGTCA is moot.

Under common law, a trespass claim is generally "an intentional or negligent intrusion upon or to the possessory interest in property of another." *Schuman v. Greenbelt Homes, Inc.*, 212 Md. App. 451, 475, 69 A.3d 512, 526 *cert. denied sub nom. Schuman v. Greenbelt Homes*, 435 Md. 269, 77 A.3d 1086 (2013) (citation and quotation marks omitted). In Ms. Litz's Third Amended Complaint, she alleged that the "Town, County, DHMH and the State are invading and have invaded Litz's property by approving residential septic systems in the Town that channel polluted ground water and discharge those waters in unnatural and harmful quantities, qualities, and rates of flow onto Litz's property." In our earlier opinion in this litigation, we found that the

24

complaint alleged a continuing cause of action on this score because, in the light most favorable to Ms. Litz, "a trier of fact could conclude that the Town's duties were ongoing and continuous." *Litz I*, 434 Md. at 648-49, 76 A.3d at 1091. In specific reference to the trespass claim, we concluded that

> Although her cause of action for trespass appears to be in reference to the ongoing effects from the approval of the septic systems, drawing reasonable inferences in the light most favorable to [Ms.] Litz, we do not construe this allegation to assert that the Town on a single occasion approved a septic system in Goldsboro that has channeled polluted water onto her property. Additionally, there is nothing in the Complaint that indicates that the Town did not approve any septic systems within three years of [Ms.] Litz filing a claim in 2010. From the earlier allegations that the private septic systems all penetrated the groundwater, that they were contributing to contamination of the ground and surface water, that such water was channeled eventually into Lake Bonnie, and that the contamination problems continued over a long period of time, one could infer reasonably that approval of septic systems by the Town contributed to the continual flow of effluent from the Town to Lake Bonnie.

*Litz I*, 434 Md. at 650, 76 A.3d at 1091. Thus, Ms. Litz's trespass claim was not barred by the relevant statute of limitations. We are tasked here, however, with determining whether the LGTCA's notice requirement applies to the trespass claim. The Court of Special Appeals determined that a trespass claim is considered a tort subject to the LGTCA. We agree.

The Court of Special Appeals relied on our decision in *Lee v. Cline* to conclude that the LGTCA embraced trespass claims. In *Lee,* our focus was on the language of the MTCA, which "plainly appear[ed] to cover intentional torts and constitutional torts as long as they were committed within the scope of state employment and without malice or gross negligence." *Lee,* 384 Md. at 256, 863 A.2d at 304. Because the "term 'tort' as

25

defined by Blacks encompasses all 'civil wrong,' not just wrongs that were recognized as a civil wrong at common law," it would follow necessarily that a trespass claim is included within this definition. *Espina*, 442 Md. at 325, 112 A.3d at 450.

Ms. Litz takes issue with the intermediate appellate court's reliance on *Lee* because *Lee* involved an interpretation of the MTCA, not the LGTCA. The MTCA was amended in 1985[17] to broaden the coverage "to include tort actions generally, with certain specified exceptions and limitations. Section 12-104(a)(1) of the State Government Article now provides that . . . [n]either intentional torts (in the absence of malice), nor torts based upon constitutional violations, are excluded." *Lee*, 384 Md. at 255, 863 A.2d at 303. Therefore, under this statute, as long as the intentional tort or constitutional violation was "committed within the scope of state employment and without malice or gross negligence," it is subject to the MTCA. *Lee*, 384 Md. at 256, 863 A.2d at 304. Because "the purpose of the [Maryland] Tort Claims Act's immunity is to insulate state employees generally from tort liability if their actions are within the scope of

---

[17] When the General Assembly enacted the Maryland Tort Claims Act in 1981, the wavier of the State's governmental immunity was limited to six distinct categories of claims:

> These six categories were limited to specific types of negligence actions such as the negligent operation or maintenance of a motor vehicle, negligence by a state health care employee, defective conditions in state structures or property, and negligent actions by state employees in state parks or recreation facilities. These six categories would not have encompassed intentional torts or tort actions based upon constitutional violations.

*Lee*, 384 Md. at 255, 863 A.2d at 303.

26

employment and without malice or gross negligence," it would be reasonable for this "broader purpose" to apply fully to non-malicious intentional torts and covered constitutional violations. *Lee*, 384 Md. at 261, 863 A.2d at 307.

There is not a vast chasm between the language of the two statutory tort claim schemes as to the tortious conduct covered. The LGTCA was enacted for a purpose similar to the MTCA, to "provide a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts." *Ashton v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 465-66 (1995). Consequentially, the analysis for which tortious conduct is covered would be largely identical.[18] The LGTCA "covers municipalities and counties and applies to 'employees,' as distinguished from the common law concept of public officials, and it applies to all torts without distinction, including intentional and constitutional torts." *Thomas v. City of Annapolis*, 113 Md. App. 440, 457, 688 A.2d 448, 456 (1997). Because the language of the LGTCA makes no distinction between intentional and non-intentional torts, Ms. Litz's trespass claim against the Town of Goldsboro would be subject to the LGTCA and its notice requirement.

The notice requirement of the LGTCA is "intended to apprise a local government

_____

[18] The only major difference between the two statutes for present analytical purposes is the protection that each affords the state employees – the MTCA provides state employees with direct immunity from suit, whereas the LGTCA grants to local government employees only immunity from damages, not from suit.

of its possible liability at a time when it could conduct its own investigation, i.e., while the evidence was still fresh and the recollection of the witnesses was undiminished by time, sufficient to ascertain the character and extent of the injury and its responsibility in connection with it." *Prince George's Cnty. v. Longtin*, 419 Md. 450, 466-67, 19 A.3d 859, 869 (2011) (citing *Rios v. Montgomery County,* 386 Md. 104, 126–27, 872 A.2d 1, 14 (2005)). Under the LGTCA, "an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 1 year after the injury." Maryland Code (1974, 2013 Repl. Vol.), Courts & Judicial Proceedings Article § 5-304(b)(1) ("CJP"). It further requires a plaintiff to provide notice in writing and "shall state the time, place, and cause of the injury." CJP § 5-304(b)(2).

We concluded previously that Ms. Litz's trespass claim was a continuing tort based on the "ongoing effects from the approval of the septic systems." *See Litz I*, 434 Md. at 650, 76 A.3d at 1091-92. Because we were not asked in the earlier case to determine whether Ms. Litz's notice under the LGTCA was timely, we affirm now the judgment of the Court of Special Appeals, which concluded that Ms. Litz may be able to show that her notice to the Town under the LGTCA was timely, and hold that it was improper for the Circuit Court to grant the Town's motion to dismiss Ms. Litz's trespass claim at this preliminary stage of litigation. Discovery will reveal likely the answer to this asserted defense.

Thus, Ms. Litz is entitled to continue to litigate her tort claims (negligence and trespass) against the Town, but must show compliance with the notice requirements of

the LGTCA. We conclude further that her inverse condemnation claims against the State Respondents and the Town may proceed, without regard to the notice provisions of the MTCA or the LGTCA.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR CAROLINE COUNTY FOR FURTHER PROCEEDINGS. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.**

Circuit Court for Caroline County
Case No. 05-C-10-013616

Argued: November 9, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 23

September Term, 2015

_____

GAIL B. LITZ

v.

MARYLAND DEPARTMENT OF THE
ENVIRONMENT, ET AL.

_____

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T. (Retired,
Specially Assigned),

JJ.

_____

Concurring and Dissenting Opinion by Watts,
J., which Battaglia and McDonald, JJ., join

_____

Filed:  January 22, 2016

Respectfully, I concur in part and dissent in part. I agree with the Majority that "the tort of trespass is covered by the notice requirement of the" Local Government Tort Claims Act ("the LGTCA"). Maj. Slip Op. at 9.[1] Assuming that we reach the issue, I also agree with the Majority that "a claim for inverse condemnation is not covered by the notice provisions of" the LGTCA and the Maryland Tort Claims Act ("the MTCA"). Maj. Slip Op. at 9. I, however, would not reach that issue because I agree with the Court of Special Appeals that Gail B. Litz ("Litz"), Petitioner, failed to state a claim for inverse condemnation against the State and its agencies (together, "the State"). Accordingly, I would affirm the judgment of the Court of Special Appeals.[2]

---

[1]As the Majority notes, in its petition for a writ of *certiorari*, the Town contended that Litz failed to state a claim for trespass. This Court denied the Town's petition for a writ of *certiorari*, and granted only Litz's petition for a writ of *certiorari*, which did not present a question as to whether Litz stated a claim for trespass. Thus, like the Majority, I express no opinion on whether Litz adequately stated a claim for trespass, as that issue is not before this Court.

On a related note, the Majority lists, as one of the questions presented in Litz's petition for a writ of *certiorari*, the issue of "[w]hether the Court of Special Appeals exceeded the scope of this Court's remand order[.]" Maj. Slip Op. at 8. In a footnote, the Majority notes that this issue "was not briefed fully by all sides[,]" Maj. Slip Op. at 8 n.9, but the Majority states: "[W]e will exercise our discretion to decide the issues, which we have determined are before us properly[,]" Maj. Slip Op. at 9 n.9. The Majority, however, does not address the issue of whether the Court of Special Appeals exceeded the scope of this Court's remand order. Given that the Majority expresses no opinion on this issue, neither do I.

[2]The Circuit Court for Caroline County ("the circuit court") dismissed all of Litz's claims against all of the defendants. Litz appealed, and the Court of Special Appeals affirmed. Litz filed a petition for a writ of *certiorari*, which this Court granted. See Litz v. Md. Dep't of the Env't, 429 Md. 81, 54 A.3d 759 (2012). This Court affirmed in part, reversed in part, and remanded to the Court of Special Appeals. See Litz v. Md. Dep't of Env't, 434 Md. 623, 657, 76 A.3d 1076, 1096 (2013). On remand, the Court of Special Appeals, among other things: (1) affirmed the circuit court's dismissal of Litz's claim for inverse condemnation against the State; (2) reversed the circuit court's dismissal of Litz's

The Majority candidly acknowledges that it is writing on a blank slate. Specifically, the Majority states:

> A difficulty with [] Litz's claim of a "taking" fitting neatly within conventional thinking about inverse condemnation is that her allegations focus predominantly on the inaction of Respondents, rather than any affirmative action by those parties. **There is no controlling Maryland law that we could find that sheds light on this wrinkle.**

Maj. Slip Op. at 13 (emphasis added). The Majority proceeds to discuss out-of-State cases, and ultimately holds that Litz stated a claim for inverse condemnation based on Respondents' inaction. See Maj. Slip Op. at 13-17.

I would write on the blank slate differently. Specifically, I would hold that, to state a claim for inverse condemnation, a plaintiff must allege that some kind of affirmative action by a governmental entity constituted a taking; I would not hold that an omission by

---

claims for inverse condemnation and trespass against the Town; and (3) remanded to the circuit court.

The Majority: (1) reverses the Court of Special Appeals's affirmance of the circuit court's dismissal of Litz's claims for inverse condemnation against the State; (2) affirms the Court of Special Appeals's reversal of the circuit court's dismissal of Litz's claims for inverse condemnation and trespass against the Town; and (3) remands to the Court of Special Appeals with instructions to remand to the circuit court. See Maj. Slip Op. at 28-29. In other words, on remand in the circuit court, Litz's claim for inverse condemnation against the State, and her claims for inverse condemnation and trespass against the Town, will remain.

As the Majority does, I would affirm the Court of Special Appeals's reversal of the circuit court's dismissal of Litz's claims for inverse condemnation and trespass against the Town; however, unlike the Majority, I would also affirm the Court of Special Appeals's affirmance of the circuit court's dismissal of Litz's claims for inverse condemnation against the State. In other words, under my position, on remand in the circuit court, Litz's claims for inverse condemnation and trespass against the Town would remain, but Litz's claim for inverse condemnation against the State would not. As noted above in Footnote 1, this Court denied the Town's petition for a writ of *certiorari*; thus, the issue of whether Litz stated claims for trespass or inverse condemnation against the Town is not before this Court.

a governmental entity can constitute a taking. The definition of "inverse condemnation," examples of claims for inverse condemnation, and judicial restraint lead me to this result.

Earlier in this litigation, in Litz v. Md. Dep't of Env't, 434 Md. 623, 652, 76 A.3d 1076, 1093 (2013), we noted that an "[i]nverse condemnation is a taking without just compensation." (Citation omitted). In other words, a claim for inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been *taken* **in fact** by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency[.]" Id. at 653, 76 A.3d at 1093 (some emphasis added) (citation and internal quotation marks omitted). Implicit in the definition of "inverse condemnation" is the principle that, to engage in an inverse condemnation, a governmental entity must, in fact, "take" property through some kind of affirmative action, as opposed to an omission.

This Court's precedent offers examples of claims for inverse condemnation, and it appears that every single one of them was based a governmental entity's alleged active taking of property through some kind of affirmative action, as opposed to an omission. For example, in MacLeod v. City of Takoma Park, 257 Md. 477, 481, 478, 263 A.2d 581, 584, 582 (1970), a plaintiff raised a claim for inverse condemnation where a city demolished the plaintiff's fire-damaged building. In Reichs Ford Rd. Joint Venture v. State Roads Comm'n of the State Highway Admin., 388 Md. 500, 506, 505, 504, 880 A.2d 307, 310, 309 (2005), a plaintiff raised a claim for inverse condemnation where, without "formally exercis[ing] its eminent domain powers[,]" the State Roads Commission of the State Highway Administration of the Maryland Department of Transportation took steps to

condemn the plaintiff's property, thus allegedly scaring off the plaintiff's existing tenant and future tenants.[3] Similarly, in Coll. Bowl, Inc. v. Mayor & City Council of Balt., 394 Md. 482, 489, 907 A.2d 153, 157 (2006), a plaintiff raised a claim for inverse condemnation where a city allegedly "us[ed] the threat of condemnation to force the [plaintiff's landlord] to undertake its own redevelopment of the [plaintiff's] building."[4]

In Coll. Bowl, 394 Md. at 489, 907 A.2d at 157, this Court offered even more examples of inverse condemnation, stating:

> [A]n inverse condemnation can take many different forms[: ]the denial by a governmental agency of access to one's property, regulatory actions that effectively deny an owner [of] the physical or economically viable use of the property, conduct that causes a physical invasion of the property, hanging a credible and prolonged threat of condemnation over the property in a way that significantly diminishes its value, or . . . conduct that effectively forces an owner to sell.

One of these types of inverse condemnation, a "regulatory taking," occurs where a governmental entity adopts a "regulation [that] deprives the property owner of all viable economic use of the entire property at issue[.]" City of Annapolis v. Waterman, 357 Md. 484, 507, 745 A.2d 1000, 1012 (2000) (citation and footnote omitted); see also Muskin v. State Dep't of Assessments & Taxation, 422 Md. 544, 566, 30 A.3d 962, 974 (2011) ("To

---

[3]Specifically, in Reichs Ford Rd. Joint Venture, 388 Md. at 504, 880 A.2d at 309, a lessee operated a gas station on the plaintiff's property. The State Roads Commission "met with . . . the lessee . . . to inform it of the intended condemnation[.]" Id. at 505, 880 A.2d at 309. The lessee "elected not to exercise its option to extend the lease term with [the plaintiff], apparently due to the looming specter of condemnation." Id. at 505, 880 A.2d at 309. The plaintiff "claim[ed] that it was unable to lease the property as a gas station or for any other economically viable use due to the [State Roads Commission]'s plans." Id. at 505, 880 A.2d at 310.

[4]In Coll. Bowl, 394 Md. at 491, 907 A.2d at 158, this Court concluded that "[t]here was no taking."

determine whether a regulatory taking occurred, the Court must look to the facts of the individual case and consider the following factors: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action." (Citation and internal quotation marks omitted)).

In each of these scenarios, a plaintiff attempts to hold a governmental entity responsible for something that the governmental entity **did**, not something that the governmental entity did **not** do.  By contrast, here, Litz advances the novel legal theory that governmental entities "took" her property by omission or inaction.  The Majority endorses Litz's theory by "recogniz[ing] an inverse condemnation claim based on alleged 'inaction' when one or more of the defendants has an affirmative duty to act under the circumstances."  Maj. Slip Op. at 13.

To me, this is essentially the equivalent of creating a private right of action[5] anytime that a plaintiff's property decreases in value as a result of a governmental entity's noncompliance with a statute—even if nothing in the statute's language or legislative history indicates that the General Assembly intended to create a private right of action.  As the Majority notes, "[u]nder the current version of the Environment Article of the Maryland Code, the State is empowered to step-in to ensure the enforcement of the Federal Water

---

[5]"A private right of action is a basis upon which a claimant may bring a claim." State Ctr., LLC v. Lexington Charles Ltd. P'ship, 438 Md. 451, 517, 92 A.3d 400, 439 (2014); see also Private Right of Action, Black's Law Dictionary (10th ed. 2014) ("**private right of action**  An individual's right to sue in a personal capacity to enforce a legal claim." (Bolding in original)).

Pollution Control Act." Maj. Slip Op. at 19-20 (citing Md. Code Ann., Envir. (1984, 2013 Repl. Vol.) ("EN") § 9-253). In turn, EN § 9-253 states in its entirety:

> (a) *In general.* — For purposes of the Federal Water Pollution Control Act, the Secretary [of the Environment] is the State water pollution control agency in this State. (b) *Granting of powers to Secretary.* — The Secretary [of the Environment] has all powers that are necessary to comply with and represent this State under the Federal Water Pollution Control Act. (c) *Other units of State government prohibited from exercising powers.* — Another unit of the State government may not exercise any power given to the Secretary [of the Environment] under this section.

(Paragraph breaks omitted). Nothing in EN § 9-253's language indicates that the General Assembly intended to create a private right of action anytime that a plaintiff's property decreases in value as a result of the Secretary of the Environment's noncompliance with the Federal Water Pollution Control Act.

Respectfully, the Majority neither mentions EN § 9-253's legislative history nor addresses whether EN § 9-253's legislative history indicates that the General Assembly intended to create a private right of action. Accordingly, there is no basis for affording the equivalent of a private right of action based on a governmental entity's noncompliance with EN § 9-253. See Walton v. Mariner Health of Md., Inc., 391 Md. 643, 669, 894 A.2d 584, 599 (2006) ("Where the legislative history does not indicate any discussion whatsoever as to whether a statute gives rise to [] a[n implied private] right [of action], the fact that the [statute] is silent would weigh heavily against an intent by the [General Assembly] to create a private cause of action.").

Simply stated, I would hold that an affirmative action by a governmental entity— *i.e.*, a "taking"—is essential to a claim for inverse condemnation. Alleging an omission or

inaction by the governmental entity is insufficient to state a claim for inverse condemnation.  By holding otherwise, the Majority greatly expands the definition of inverse condemnation, the consequences of which are yet to be seen.

For the above reasons, respectfully, I concur in part and dissent in part.

Judge Battaglia and Judge McDonald have authorized me to state that they join in this opinion.